[S. F. No. 15797. In Bank.—January 22, 1940.]

AMERICAN TRUST COMPANY (a Corporation), Appellant, v. CALIFORNIA WESTERN STATES LIFE INSURANCE COMPANY (a Corporation), Respondent.

Brobeck, Phleger & Harrison for Appellant.

Williamson & Wallace, Ware & Ware, Downey, Brand & Seymour, Stephen W. Downey, James D. Adams and McCutchen, Olney, Mannon & Greene for Respondent.

Neil Cunningham and George H. Downer, as *Amici Curiae*, on Behalf of Respondent.

CARTER, J.—This is an action for declaratory relief with respect to an agreement of defendant and respondent to repurchase shares of its own stock previously sold to plaintiff and appellant. The case involves substantially the same issues as *California Western States Life Insurance Co.* v. *Pacific American Co., Ltd.*, S. F. No. 16026, *post*, p. 763 [98 Pac.

(2d) 511], and *California Western States Life Insurance Co.*
v. *Tucker*, S. F. No. 16027 (*post*, p. 69 [98 Pac. (2d) 511]),
this day decided. We are accordingly presenting the back-
ground of these three actions in this opinion. The essential
facts, as found by the trial court in each case are practically
undisputed and are amply supported by the evidence in the
record. Since these facts are largely determinative of the
issues, we set them forth in some detail.

Preliminary to any discussion of the transactions involved,
it is necessary to identify the principal parties concerned.
California State Life Insurance Company (herein called
"California") was, prior to August, 1931, a life insurance
corporation organized and doing business under the law of
California. Its main office was in Sacramento. Western
States Life Insurance Company (herein called "Western")
was also a California life insurance corporation prior to
August, 1931. Its main office was in San Francisco. De-
fendant and respondent, California Western States Life In-
surance Company (herein called "California-Western" or the
"combined company"), is the former California State Life
Insurance Company which changed its name after its pur-
chase of the business and assets of Western States Life In-
surance Company in 1931, this purchase having effected a
practical consolidation of the two companies. J. Roy Kruse
was the president of California who wished to acquire the
business of Western, and acted for California during the
period of the negotiations leading toward consolidation. The
shares of Western were owned by some 1400 persons, includ-
ing the following four large stockholders, who held in the
aggregate 45 per cent thereof: Pacific American Company,
Ltd., and American National Company, wholly owned sub-
sidiaries of Goldman-Sachs Trading Corporation, owning 25
per cent of the shares. (American Trust Company, plaintiff
herein, acquired the interest and rights of American National
Company prior to this action.) Mrs. Nion Tucker, owning
5 per cent. (Mrs. Tucker took no active part in the trans-
actions, being represented at all times by her husband.) A. D.
King, president of Western and a director thereof, owning
15 per cent. Nion Tucker was president of Tucker, Hunter,
Dulin & Co., a brokerage firm, also a wholly owned subsidiary
of Goldman-Sachs Trading Corporation, president and a di-
rector of Pacific American Company, a director of American

National Company, and a director of Goldman-Sachs Trading Corporation, during the period of most of the transactions; he was also a director of Western, and after the consolidation, a director in the combined company.

The transactions began in the early part of 1931, when Kruse, president of California, desired to acquire the business and assets of Western, the larger company. He needed the consent of two-thirds of the shares, and therefore approached Tucker, who was not only a director of Western but associated in various ways with the other large stockholders, and who represented them in these negotiations. The two placed a valuation of $7,000,000 on the business and assets of Western, and with its 100,000 shares, this amounted to $70 for each share of Western stock. Kruse was unable to raise the cash, and thereafter proposed an alternative plan to pay $4,000,000 in cash, and stock in his company (California) of the par value of $500,000. The par value of California stock was $5 per share, but its market value at this time was $40 per share. The contemplated method of payment was to give each Western shareholder $40 cash, plus one-half share of California stock, worth $20 at that time, or the equivalent of $60 for each Western share (which then was selling at between $46 and $56). California did not have the $4,000,000 in cash and it was intended that this sum should come from two sources: first, a new issue of California stock at its then market value, $40 per share (or $20 per half share), and second (the major portion), from the cash and liquid assets of California itself and of Western after its acquisition. The plan thus outlined eventually became the general offer to the Western shareholders.

This plan, however, meant a valuation of $60 per share of Western instead of the original valuation of $70, and although this was considered acceptable in so far as the general offer to stockholders was concerned, Tucker and his principals refused to sell for less than the original $70 price. Accordingly, it was agreed between Kruse and Tucker that the four large stockholders would sell their stock for the regular price, namely, $40 cash plus one-half share of California stock then worth $20, but that California would agree to repurchase the California stock of these four at $30 per half share, $10 more than its market value at this time. The repurchase was to take place within two years, with 6 per cent interest to be

paid by California on the repurchase price. The four stockholders owned 45 per cent of the Western stock, or 45,000 shares, for each of which they were to receive a half share of California stock to be eventually repurchased at $30, with interest. California, therefore, was to undertake a liability under the repurchase agreements of $1,350,000, or with interest, approximately $1,400,000.

Tucker, Hunter, Dulin & Co., for its brokerage services in negotiating the deal, was to receive a commission of $200,000 if it succeeded. This was ultimately paid, and thereafter part was divided by Tucker, Hunter, Dulin & Co. between two of its principals, namely, Mrs. Tucker, who received $25,000, and King, president of Western, who received $100,000.

The plan outlined above was then reduced to writing and carried out in several agreements and proposals as follows:

1. *Agreement between California and Tucker, Hunter, Dulin & Co.* On June 10, 1931, an agreement was made between California and Tucker, Hunter, Dulin & Co., in which California offered to pay for each share of Western stock deposited under the offer, $40 per share and one-half share of California stock, provided that at least 66,667 shares (being 2/3) of the stock of Western were deposited before October 1, 1931. This agreement provided, in substance, (1) that California would make a general offer to Western stockholders (see *infra*); (2) that Tucker's firm as broker was to attempt to obtain deposit of as many Western shares as possible, for which California was to pay a commission of $200,000; (3) that California would issue 100,000 additional shares, of which a maximum of 50,000 would be available for the purchase of the Western shares on the one-half share basis, and the rest should be offered for subscription at $40 per share, the incoming Western shareholders being entitled to subscribe to 20,000 of the new shares on the basis of 2 new shares for every 5 California shares acquired under the purchase; and (4) the offer was subject to the condition that the transaction be approved by the state insurance commissioner (see below).

2. *General offer to Western stockholders, to buy their stock.* This document stated (1) that a plan of consolidation of the two companies had been devised, and offered to buy shares at the above-mentioned price; it further stated (2) that the offer was subject to the condition that the insurance commis-

sioner approve the transfer of Western's assets under a proposed agreement of sale and reinsurance; (3) that after consolidation there would be over $260,000,000 of insurance in force, over $45,000,000 of assets, and a paid-up capital of $1,750,000. This offer was, on June 12, 1931, sent to all Western stockholders by Western's secretary. Later, about July 1, 1931, the secretary addressed a further notice to stockholders, in which he said, with reference to the general offer theretofore made: ''The complete terms of the offer are set forth in that letter.''

3. *General offer to Western stockholders of subscription rights in California.* This document recited the plan already described, and informed Western stockholders that if they sold their stock and received cash and California stock under the general offer, they would have the right to subscribe to two additional shares of California stock for every five shares they received. This offer was sent out by California.

4. *Agreement of sale and reinsurance.* This contract was made between California and Western, in which Western agreed to sell all its business and assets of every kind, in consideration of the payment by California for the credit of Western stockholders of $4,000,000 in cash, and 50,000 shares of California stock, which should be held by American Trust Company as depositary, for distribution to Western stockholders under the purchase agreement. California agreed to assume all liabilities of Western and to reinsure all policies. The agreement was made subject to approval of the insurance commissioner. Later, on August 19, 1931, he endorsed his approval thereon, finding the same to be in accordance with the law ''and such as to protect the interest of all policy holders'' of Western.

5. *Repurchase agreements.* Agreements were made on June 10, 1931, contemporaneously with the Tucker, Hunter, Dulin & Co. contract, between California and each of the four large Western stockholders, providing that in the event that they sold their shares to California in accordance with the general offer, California agreed to repurchase them within two years at $60 per share (i. e., $30 per half share) plus 6 per cent of the total sum (as interest), less any dividends declared on the repurchased shares.

We have thus far described the negotiations, the plan of purchase, and the instruments devised to carry it out. In

all of the discussions Kruse acted by himself, without prior authorization by the California board of directors. Tucker also acted for his principals without authorization by the directors of Western. It therefore became necessary on June 10, 1931, when the Tucker, Hunter, Dulin & Co. contract and the repurchase agreements were signed, to obtain the approval of the two companies, and this constitutes the second stage of the transactions. For this purpose, Kruse met with the directors of California on June 12, 1931, and they authorized the Tucker, Hunter, Dulin & Co. agreement and the agreement of sale and reinsurance. At later meetings the issuance of the new stock was authorized. No one but Kruse and the then attorney for the company knew of the repurchase agreements, and Kruse made no mention of them. Some of the directors were led to believe that the company had or would receive an *option* to acquire stock, but no suggestion of an obligation to purchase any stock was made. Nor did Kruse enter these agreements in the corporate records or keep them with other documents of the company. He placed them in a private safe in his office to which he alone had access, and never disclosed their contents until 1933. The liability of about $1,400,000 under these agreements never appeared on the company's statements to stockholders, nor on the books, and was not disclosed to the insurance commissioner's representatives at the time of their examination of the books of the company.

Tucker met with the directors of Western on June 10, 1931. The plan was described, the general offer to purchase discussed, and the directors adopted a resolution ordering the secretary to send the same to the stockholders. At a subsequent meeting the agreement of sale and reinsurance was authorized. Of the thirteen directors who approved the purchase offer, only Tucker and those associated with him knew of the repurchase agreements. These were King, the president (one of the parties to the repurchase agreements), Lochead, vice-president and a director of plaintiff (American Trust Company), and Ford. They voted for the plan, but made no disclosure of the repurchase agreements.

The only record of these commitments which appeared anywhere was the entry by Pacific American Company in its books, and a general item in the Goldman-Sachs 1932 statement to its stockholders, which found its way into Moody's

Manual, that the California-Western stock of Pacific American Company was held "at contract sales price" of $60 per share. There was no mention of the repurchase agreements of the other stockholders, nor of the fact that California-Western was the buyer obligated under the contract referred to. None of the California-Western stockholders or directors other than those mentioned ever learned of the facts through these sources.

With approval of the companies thus obtained, the plan went into operation. Four directors of Western became members of California's board: Tucker, King, and Lochead (all of whom had knowledge of the whole transaction), and Hawley, holder of the proxy to vote the deposited Western stock (who did not have such knowledge). The four large stockholders deposited their holdings, and practically all the other Western stockholders also came in, so that by August 19, 1931, California owned substantially all of the outstanding Western shares. A meeting of Western stockholders was held and the sale of the business approved. The name of the combined company was changed to California-Western States Life Insurance Company. No disclosure was made to the stockholders of the repurchase agreements or the liability of the combined company under them. The plan was presented to the insurance commissioner and he approved the agreement of sale and reinsurance, but no disclosure of these facts was made to him. The capital stock was increased from 75,000 shares to 175,000 shares of the same par value and a permit was obtained from the insurance commissioner to issue the additional shares to subscribers, without disclosure of the repurchase agreements. The purchase was consummated by the deposit in escrow with American Trust Company, for Western stockholders, of 50,000 shares of stock and payment of the $4,000,000 in cash to Western. Of this sum, $2,000,000 was raised by the issuance of the new stock; $1,350,000 was taken from the assets of Western; and $400,000 of the balance was borrowed from American Trust Company.

The third development occurred in 1932 when Pacific American Company, needing money, entered into an agreement through G. Parker Toms, its then president, with Kruse, to satisfy its repurchase contract in advance of the due date at a discount. The agreement was evidenced by a letter from Kruse to Toms, dated July 8, 1932, in which Kruse, on

behalf of California, stated that Pacific American Company's 5,025 shares of California-Western stock would be taken up not later than July 22, 1932, at $50 per share (or $25 per half share, instead of the $30 called for under the agreements), a total of $251,250. At this time the market price of the stock was $30 per share. Kruse made no disclosure of this proposed transaction to his company, and in order to carry it out made use of Westerlic corporation, a wholly owned subsidiary of California-Western, as a conduit. Westerlic corporation had been used by California-Western in occasional business transactions, but had no assets. The arrangement was that Westerlic corporation bought the shares and paid the money to Pacific American Company. Then Kruse had a loan made by California-Western to Westerlic in the amount of the purchase price. Later in 1932 Westerlic obtained a bank loan to repay California-Western. The details of the repurchase thus did not appear on the books or financial statement of California-Western, nor in its report to the insurance commissioner, and consequently the repurchase agreements still remained secret.

The fourth stage begins in 1933. The repurchase agreements were to become due June 10, 1933, and California-Western was financially unable to perform. In a letter dated May 31, 1933, to Lochead of American Trust Company, Kruse listed various losses of the company in its operations, stating that "we cannot afford to make any disbursements at the present time that will in any way have a possible bearing upon the security of the policyholders," and adding that "It is almost imperative that we secure the relief asked for." Discussions followed, and an agreement was reached under which California-Western was to pay one-half the amount due under the repurchase agreements of American Trust, King and Mrs. Tucker, and receive an extension of time as to the balance, giving its promissory notes therefor to become due on March 1, 1934, and January 1, 1935. Toms, president of American Trust Company, sent Kruse copies of the proposed agreements and promissory notes drafted by its counsel. Toms also requested, on advice of counsel, that California-Western adopt a resolution reciting that California-Western had earned surplus equal to the full amount of the purchase price and that the stock was being purchased from earned surplus, and further, that the resolution comply with

section 421 of the Civil Code relating to investments of life insurance companies, calling for a ⅔ vote of directors, with entries in the minutes of the names of approving directors and other data.

To carry out this agreement a directors' meeting of California-Western was held on June 13, 1933, at which two-thirds, or seventeen directors were present. At this meeting the repurchase agreements were first disclosed to the board of California-Western, and the new agreement calling for partial payment was explained. The directors who had previous knowledge of the facts were Kruse, Tucker, Lochead, and a few others who had learned of them from Kruse at times prior to the meeting. The other directors were without any prior knowledge. In response to objections and protests by directors Gibbons and Grimshaw, Kruse stated that the repurchase agreements were binding and that the company had no alternative. The then counsel for the company was present and likewise advised that they were binding and it was necessary to comply with them. Thereupon the board voted to adopt the resolutions authorizing the partial payment and promissory notes for the balance in conformity with the agreements drawn by counsel for American Trust Company. The agreements were signed, the part payment made, and the notes delivered, following which the three stockholders (American Trust Company, King and Mrs. Tucker) turned in their stock. Half of the stock was however, deposited with American Trust Company in pledge to secure the promissory notes. The cash with which the half-payment was made was procured in part as a loan from American Trust Company. At the time of this transaction involving the partial performance of the repurchase agreements calling for a price of $60 per share, the market price of the stock was $20 per share.

The fifth and final stage began at the end of 1933 when other stockholders discovered the facts surrounding the repurchase agreements. In response to their demands the directors authorized suits to recover money paid under the repurchase agreements. Accordingly, California-Western, on December 5, 1933, disaffirmed the repurchase, the payments and the notes, gave notice of cancellation of the agreements, offered to return the certificates and to pay any dividends thereon from June 13, 1933. This was refused, and Cali-

fornia-Western thereupon, as plaintiff, filed two actions, one against Pacific American Company, and the other against Mrs. Tucker. American Trust Company filed the present action as plaintiff, against California-Western, seeking declaratory relief with respect to the agreements. No suit was brought against King, for in 1933 he voluntarily agreed to set aside his contracts, and restored the money he had received, including his share of the commissions obtained through Tucker, Hunter, Dulin & Co. for the original negotiation of the deal.

The three cases were tried separately, separate findings were made in each, and separate appeals were taken. Nevertheless, as we have already stated, the basic issues and the evidence are the same and we have chosen to discuss them fully in this opinion.

The trial court in the instant case made comprehensive findings setting forth the facts summarized above, and further found as follows:

That it was not the intention or understanding of the parties that the agreements of June 10, 1931, should constitute one contract, or that the performance of the Tucker, Hunter, Dulin & Co. contract of sale and reinsurance contract were dependent on consummation of the repurchase contract; but the intention and understanding was that these several agreements were independent, severable, and to be performed separately.

That Kruse was not authorized to enter into the repurchase agreement on behalf of the corporation, and that California's board of directors did not at the meeting of June 12, 1931, or at any other time authorize, approve or ratify the repurchase agreement.

That none of the other stockholders of Western, when depositing their stock or subscribing for shares of the new issue, knew of the repurchase agreements, but all believed and were not otherwise advised or informed, that the four large stockholders were depositing and subscribing strictly according to the terms of the general offer and on the same basis as the others.

That the repurchase agreement with American National Company was a secret and undisclosed stipulation modifying its subscription to the 7,150 additional shares, to the detriment of all the other subscribers, and to the detriment of

defendant, California Western States Life Insurance Company, and its creditors and was prohibited by statute and was a fraud upon said defendant and all of its stockholders.

That the repurchase agreement became effective and irrevocable on July 14, 1931, when over two-thirds of the Western stockholders deposited their shares; and that up until August 14, 1931, said agreement to repurchase was in violation of section 354 of the Civil Code, and void for illegality.

That at the directors' meeting of June 13, 1933, Tucker and Lochead who voted for the resolution were both at that time directors of American Trust Company (plaintiff), which company was interested in the repurchase both of its shares and those of Mrs. Tucker which it held as collateral security.

That at said directors' meeting of June 13, 1933, there was no disclosure of the interests of Lochead and Tucker, nor were they noted in the minutes; nor, despite their knowledge of the facts, was it disclosed that the repurchase agreements had never been authorized or ratified by the directors or stockholders; or that defendant did not have at this meeting date adequate earned surplus to make the purchase; or that the expenditure of these sums would seriously impair its financial condition and embarrass it in its operations; or that it would be necessary to borrow (and it did borrow) $400,000 from plaintiff (American Trust Company); or that the purchases would amount to more than 25 per cent of defendant's capital and surplus and would exceed 30 per cent of its total capital; or that defendant had suffered heavy losses and the market price of its shares was not over $20 per share.

That on said date of June 13, 1933, the combined company did not have any earned surplus at all; that the price paid for the stock was three times its market value; that this payment amounted to more than 25 per cent of the capital and surplus and more than 30 per cent of the total capital of the company.

That the repurchase agreements were not reported to the insurance commissioner or approved by him at the time; nor were they reported to or approved by the stockholders, nor known to all of the directors.

That the resolution purporting to authorize the repurchase was not regularly or legally adopted and was void; that the payments and notes given are not binding, and are illegal and void; that the repurchase was a withdrawal and distribu-

tion of a substantial part of its assets to one stockholder to the exclusion of others, and was a fraud on the stockholders, its creditors, and against public policy and void.

That the consummation of the repurchase substantially reduced and depleted the assets of the combined company, entirely exhausted its surplus, undivided profits and reserves, necessitated a reduction in the capital stock by the amount of $875,000 and correspondingly reduced the value of its outstanding shares to the direct injury of the corporation and all other stockholders and creditors, and rendered it unable to meet its obligations without said reduction of capital.

Judgment was accordingly rendered for California-Western in each case for the amount of the payments made under the repurchase agreements, with interest from June 13, 1933, and for the cancellation of the promissory notes. The stockholders were permitted to receive back the repurchased shares, together with dividends declared after the repurchase, with interest thereon.

Appeals were taken by each of the losing parties, and the attorney-general also filed a brief on behalf of the insurance commissioner in support of the judgment. Various legal propositions have been discussed, but in our opinion, the controlling issue is that of fraud, and on that issue the sole question is whether the findings, based on practically undisputed evidence, support the judgment. On the issue of illegality, which was argued in considerable detail in the briefs, it may be noted that the repurchase agreements, which the court found were made before the 1931 Civil Code amendments went into effect, were illegal and void; but the amendment to section 365 of the Civil Code in that year limited the remedy to the setting aside of the purchase to the extent necessary to meet "existing liabilities of the corporation at the time of such sale". What obligations constitute "existing liabilities" is greatly disputed. The trial court made no finding on this latter point, and the record is not, we believe, sufficiently clear for us to determine it without a retrial on the issue. Since, however, we hereinafter hold that the judgment is supported by the evidence and findings of fraud, it becomes unnecessary to decide this question of illegality. We therefore refrain from doing so, and proceed now to the discussion of the issue of fraud.

■ The manner in which the agreements, the subscriptions, and the transfer of assets, were procured, involving concealment and misstatement of material facts, relied upon by the stockholders and directors of both companies, and by the insurance commissioner, so clearly appears from the evidence and findings that fraud is an inevitable conclusion. Appellants, however, without disputing the essential facts, have presented a number of legal defenses thereto.

The chief defense is that there was no actual fraud, in the sense of active misrepresentation, but only nondisclosure, which does not amount to constructive fraud unless the party is a fiduciary with a duty to disclose the facts. They rely chiefly on *Ryder* v. *Bamberger*, 172 Cal. 791 [158 Pac. 753], *McCord* v. *Martin*, 47 Cal. App. 717 [191 Pac. 89], and *Bacon* v. *Soule*, 19 Cal. App. 428 [126 Pac. 384], which, they contend, stand for the general proposition that a corporation director owes no fiduciary obligation to the stockholder as such, but only to the corporation. Hence they conclude that nondisclosure by Kruse, Tucker and the others in their dealings with their own stock, and their nondisclosure of the repurchase agreements to the other Western stockholders, was not fraudulent because there was no duty to disclose.

The doctrine upon which appellants rely, which is said to be the majority rule, is in substance that a director is a fiduciary with respect to the corporation as an entity, and not to the stockholders as individuals. Otherwise expressed, it is that in dealings with or for the corporation, the director is exercising a corporate function, and is subject to the usual fiduciary duty to disclose all material facts; but that in personal dealings with stockholders he is not exercising a corporate function, and is free to deal with them at arms' length. Nearly all of the cases applying the rule are concerned with transactions for the purchase of stock between director and stockholder, and they hold that the director need not disclose to the stockholder his special knowledge affecting the value of the shares. (See, generally, *Carpenter* v. *Danforth*, (N. Y.) 52 Barb. 581; *Crowell* v. *Jackson*, 53 N. J. L. 656 [23 Atl. 426]; *Connolly* v. *Shannon*, 105 N. J. Eq. 155 [147 Atl. 234]; *Du Pont* v. *Du Pont*, 242 Fed. 98; 13 Am. Jur., sec. 1010; 84 A. L. R. 615; *Walker*, 32 Yale L. J. 637.) In sharp contrast with this view is the so-called minority rule, which recognizes the director's obligation to the stockholders

individually as well as collectively, and refuses to permit him to profit at the latters' expense by the use of information obtained as a result of his official position and duties. This view, while generally conceded to be in the numerical minority, is followed by able courts, and text-writers who have examined the subject. (See, e. g., *Dawson* v. *National Life Ins. Co.,* 176 Iowa, 362 [157 N. W. 929, Ann. Cas. 1918D, 230, L. R. A. 1916E, 878]; *Oliver* v. *Oliver,* 118 Ga. 362 [45 S. E. 232]; *Stewart* v. *Harris,* 69 Kan. 498 [77 Pac. 277, 105 Am. St. Rep. 178, 2 Ann. Cas. 873, 66 L. R. A. 261]; Ballantine, Private Corporations, sec. 125; Stevens on Corporations, sec. 145; 3 Pomeroy, Equity Jurisprudence, sec. 1090; 19 Corn. L. Q. 103; 45 Harv. L. Rev. 1388; 39 Yale L. J. 582.)

But this simple statement of the majority and minority rules does not present the true picture, for a number of jurisdictions which are classed in support of the majority view have recognized a major exception in the so-called "special facts" doctrine: Conceding the absence of a fiduciary relationship in the ordinary case, they nevertheless hold that where special circumstances or facts are present which make it inequitable for the director to withhold information from the stockholder, the duty to disclose arises, and concealment is fraud. The leading case is *Strong* v. *Repide,* 213 U. S. 419 [29 Sup. Ct. 521, 53 L. Ed. 853], which points out that active participation in the negotiations for a transfer of the corporate property may constitute the special circumstances to raise the duty. This case has been followed by many others. Thus, in *Poole* v. *Camden,* 79 W. Va. 310 [92 S. E. 454, 457, L. R. A. 1917E, 988], the court concedes the correctness of the majority rule, but holds that if the director instead of remaining silent, gives information to the stockholder, i. e., "undertakes to speak or *become active in inducing the sale,* he must *speak fully, frankly, and honestly, and conceal nothing* to the disadvantage of the selling stockholder". To similar effect are *Dutton* v. *Barnes,* 162 Minn. 430 [203 N. W. 414]; *Bollstrom* v. *Duplex Power Car Co.,* 208 Mich. 15 [175 N. W. 492]; *Gammon* v. *Dain,* 238 Mich. 30 [212 N. W. 957]; *McMynn* v. *Richardson-Phenix Co.,* 186 Wis. 442 [201 N. W. 272]; *Voellmeck* v. *Harding,* 166 Wash. 93 [6 Pac. (2d) 373, 84 A. L. R. 608], all of which expressly recognize the majority rule as ordinarily applicable, but follow the exception declared in *Strong* v. *Repide, supra.* In *Goodwin* v. *Agassiz,*

283 Mass. 358 [186 N. E. 659], the Massachusetts court, long committed to the majority rule, applied it where a director purchased shares on a stock exchange, but Rugg, C. J., added this warning: "On the other hand, directors cannot rightly be allowed to indulge with impunity in practices which do violence to prevailing standards of upright business men. Therefore, where a director personally seeks a stockholder for the purpose of buying his shares without making disclosure of material facts *within his peculiar knowledge and not within reach of the stockholders,* the transaction will be closely scrutinized and relief may be granted in appropriate instances" (citing *Strong* v. *Repide, supra*). (See, also, notes, 47 Harv. L. Rev. 353; 19 Corn. L. Q. 103; 14 Minn. L. Rev. 530; 13 Am. Jur., sec. 1011; 3 Fletcher, Corporations, (Perm. Ed.) sec. 1171.)

Having seen that the so-called "majority" rule for which appellants contend is subject to important limitations and exceptions even in jurisdictions which follow it, while the so-called "minority" rule has the strong support of a number of courts and distinguished writers, we proceed now to examine the three California cases so heavily relied upon for a reversal herein. Upon such examination we find that each case is entirely supportable on its facts, but is clearly distinguishable from the instant case.

In *Bacon* v. *Soule,* 19 Cal. App. 428 [126 Pac. 384], the first of the group, plaintiff Frank Bacon and his two sisters were the owners in equal shares of the entire capital stock of the Bacon Land and Loan Company, a small corporation, of which they were directors and officers. They quarreled bitterly over policy, maintained no friendly relations, and finally decided to abandon the business, dissolve the corporation and partition its properties. This was done and plaintiff received as his share a lot and dwelling house with an agreed valuation of $30,000. Thereafter he sued, alleging that the house had originally contained furnishings worth $2,000 which he believed were still in place but which had been previously sold by the corporation and removed, and that this fact had not been disclosed to plaintiff by defendants. He relied on theories of confidential relationship arising out of their blood relationship, and their business "partnership". The lower court sustained a demurrer to the complaint, and the decision was affirmed on appeal. The appellate court pointed out the

following matters, all of which are in sharp contrast to the facts of the instant case: (1) The parties were hostile to each other for ten years, dealt at arm's length, had no personal communication or dealings with each other, and hence *plaintiff had no reason to place any confidence in the defendants,* and they had no reason to suppose that he did. (2) It did not appear that the defendants by words or artifice induced the belief that the property was in the same condition in which plaintiff originally saw it. (3) Plaintiff accepted the property without making any investigation or inspection of its contents, *which were entirely open to him.* The court then briefly mentioned the rule that directors are trustees only in respect of their acts relating to the property or business of the corporation, and concluded that the defendants were dealing with plaintiff *as individuals in a transaction purely personal to each of them.*

The next case is *Ryder* v. *Bamberger,* 182 Cal. 791 [158 Pac. 753]. Plaintiff was a minority stockholder in the Salt Lake Oil Company of California. Defendants Wood, Bamberger and Price were officers and directors, owning a majority of the stock. Plaintiff's theory was that they conspired to incorporate the Amalgamated Oil Company, as a holding company, half the stock of which was to be owned by Associated Oil Company, a large and prosperous corporation; that they induced the minority stockholders of Salt Lake Oil Company to sell their stock for $2 per share, by depositing it with an escrow holder, representing that the Salt Lake Oil Company was in bad condition, and that they, the majority stockholders and directors, had accepted the same offer. Plaintiff sold his stock, and later the Amalgamated Oil Company prospered and its stock greatly increased in value. Plaintiff contended that the fiduciary relation between defendant directors and himself made it their duty to disclose the entire details of the Amalgamated Oil Company transaction, and that their failure in this respect was fraud. Judgment went for defendants, and was affirmed on appeal. Comparing this with the instant case, the following distinctions may be noted: (1) The trial court found that *every representation made by defendants was fair and true,* and that the company was in bad condition. (2) The evidence showed and the trial court found that the representative of Associated Oil Company, negotiating with defendants for the

formation of Amalgamated Oil Company, had no interest in buying out the minority shares of plaintiff and others, but contemplated "squeezing" them out by subsequent assessments on their stock; and that *defendants insisted on the offer to the minority stockholders for the protection of such stockholders,* and refused to go into the deal until that offer was made. (3) The price received by defendants *was no greater than that received by plaintiff,* and the increase in value of the Amalgamated shares was largely due to a valuable gusher which developed on other land previously owned by defendants which they had transferred to Amalgamated Oil Company in which land plaintiff never had any interest whatsoever. (4) *Disclosure* of the details of the Amalgamated deal would have been *of no value* to the minority stockholders since they could not have come in had they wanted to; instead of sale of their stock being necessary, it was in fact not wanted at all, and only the insistence of defendants resulted in an offer to purchase, rather than a squeeze-out. These are the facts, as found by the trial court and related in the opinion. The court then goes on to say that it is "unnecessary" to consider such cases as *Strong* v. *Repide, supra* (which expounds the "special facts" exception), and that there is "as little need" to consider the line of authority that directors are not bound to acquaint stockholders with all the facts. In other words, the reference to the "majority" rule by the court is no more an approval of it than its mention of the rule of *Strong* v. *Repide, supra,* and the case was actually decided on the evidence and findings, that defendants acted in good faith and for the interests of the plaintiff as well as for themselves, and that plaintiff suffered no damage as a result of the alleged nondisclosure.

The last case is *McCord* v. *Martin,* 47 Cal. App. 717 [191 Pac. 89]. Plaintiff, a stockholder in Lost Hills Mining Company, alleged that defendant Martin knew that a prospective buyer wished to purchase 20,000 shares at more than $5 per share; that defendant Martin and appellant Lindemann represented to stockholders that they knew someone who would buy 20,000 shares at $5 per share, and that defendants would join with the others in pooling their shares to reach that amount; that the pool was made in reliance upon those representations, and that the buyer, under a secret agreement with defendants, bought all the stock at $8 per share, of which

plaintiff and the others received but $5 per share. The court said: "If these facts had been shown and found it could hardly be seriously argued that plaintiffs were not entitled to a judgment against defendants. The proper legal characterization of the transaction might be in some doubt, but at any rate the principles of equity as formulated in the code and administered by the courts are ample to reach and defeat such iniquitous conduct." But the trial court found *against these allegations,* concluding that Lindemann knew nothing of the arrangement. It was further asserted by plaintiff that Lindemann was secretary of the corporation; that he received a letter from Mercantile Trust Company stating that if a client of theirs purchased a majority of the stock, the said client would pay Lindemann $15 per share for his shares. Subsequently this was done, and plaintiff contended that Lindemann should have disclosed to the other stockholders his receipt of this letter. But the court pointed out these facts, distinguishing it from our present case: (1) The stockholders placed *no reliance whatsoever on any representations of Lindemann,* but were influenced by Martin, and that Lindemann knew nothing of the plans of Martin and did not aid them in any way. (2) Lindemann was not even a director, but the secretary, a mere *ministerial officer.* The court does say that in *Ryder* v. *Bamberger, supra,* it was *held* that directors are not bound to acquaint the stockholders with facts concerning the shares, but, as we have already shown, the Ryder case does not so hold, nor does it even approve the rule by *dictum,* but merely refers to it in passing.

A brief reference to the above three cases was made in *Robbins* v. *Pacific Eastern Corp.,* 8 Cal. (2d) 241, 256 [65 Pac. (2d) 42], but the case was decided on other grounds.

These are the cases which appellants say will sanction the concealment and misrepresentation practiced in this case. We have already pointed out some of the more obvious differences in their facts; but there are other, more basic distinctions which we now come to consider. In this connection, we may observe that the question is still open in this state as to whether we shall follow the majority rule, the majority rule as modified by the "special facts" doctrine, or the minority rule; and a decision on this question would be immaterial here. For the purposes of this opinion, we may apply the strictest form of the majority rule, and still the conduct of

the parties herein finds no justification. Appellants have, to make their case fit the rule, assumed a state of facts at variance with the record, and we now proceed to an analysis of these fundamental differences which render their argument without substance.

In the first place, *this is not a case of individual dealings* by a director with a stockholder to buy his stock. Kruse and Tucker did not solicit the Western stockholders to sell or buy from them personally, concealing special knowledge which they had concerning the transaction. It was the corporation, California, which did the soliciting, buying, issuing of new stock, and later the repurchasing from the favored stockholders. Kruse and Tucker were acting for their corporations in these matters, not for themselves; they committed the corporations to the agreements, and fastened the liabilities upon them. Tucker was also acting for Western, and his activities resulted in that corporation's soliciting its stockholders to come into the deal. Nor was this a mere purchase or issuance of stock. The entire object was to *purchase the business and assets* of Western; the stock transactions were used as a means to accomplish that end. The general offer to Western stockholders, summarized above, characterized the proposal as one that the businesses "be consolidated", and declared: "The plan under which such a consolidation might be consummated has been carefully considered." The offer further asserted that certain business advantages would result "after the consolidation", and declared the intention to change the name of California thereafter to reflect the presence of both original institutions. Furthermore, an essential agreed condition to the entire transaction was the approval by the insurance commissioner of the transfer of assets, indicating clearly that the parties never had the slightest intention of buying and selling stock except as a means of accomplishing the real object, a merger of the two companies. It is impossible, therefore, to perceive any application of the doctrine relied upon by appellants, even in its most extreme form. Every important phase of the transaction herein involved corporate acts; in every development the corporations, as entities, were involved and their interests affected; and in each act prior to the 1933 discoveries, both corporations acted without knowledge of the material facts, which facts were concealed by these directors. The case therefore comes

within the settled principle that a corporation director *owes to the corporation* the highest fiduciary obligation and the fullest duty of disclosure. To this doctrine there is no dissent whatever. (See 3 Fletcher, Corporations (Perm. Ed.) secs. 838, 884; Ballantine, Private Corporations, sec. 122a; Stevens, Corporations, sec. 142; 13 Am. Jur., sec. 997; 3 Pomeroy, Equity Jurisprudence [4th ed.], sec. 1090; *Dunnett* v. *Arn,* 71 Fed. (2d) 912.)

This basic distinction between individual purchases from stockholders, and transactions for the purpose of acquiring the corporate assets, is illustrated in an important and well-considered case by the Circuit Court of Appeals, *Dunnett v. Arn, supra,* closely similar in its facts to the instant case. Plaintiffs were minority stockholders of Operators Oil Company. Defendants Cloud and Dunnett were president and secretary of the corporation and majority stockholders. Sunray Company wanted a valuable oil lease belonging to the corporation. Defendants devised a plan for Sunray Company to buy all its capital stock and contracted to deliver their own shares. Defendants then wired the minority stockholders that they had sold their own shares and advised the minority to accept an offer for their shares then being mailed to them. Various minority stockholders accepted, believing the majority had sold on the same basis. Later they sued on the ground that defendants had received a higher price per share. Relief was granted and on appeal the judgment was affirmed. The court mentioned the conflicting rules, characterizing the nondisclosure rule as the weight of authority, but pointed out that the case did not come within the scope of the rule *because the contract contemplated that Sunray Company should acquire all the stock of Operators Company.* The court said (p. 918): "While in form the plan provided for a sale by the stockholders of their individual stock, in substance it was a sale to the Sunray Company. It was therefore in substance and effect a *corporate transaction.*" That this case is not a minority rule decision is made clear in the opinion, and also by a later decision of the same court, *Roby* v. *Dunnett,* 88 Fed. (2d) 68, 69, which arose out of the same transaction. Referring to the majority rule the court said: "We noted that rule in our former opinion. We adhere to it."

The same analysis and conclusions appear in *Commonwealth Title Ins. & Trust Co.* v. *Seltzer,* 227 Pa. 410 [76 Atl. 77, 136

Am. St. Rep. 896], where defendants, president and a director of a corporation having its capital invested in a valuable piece of real estate, made a contract with an agent of another corporation giving him an option to buy the controlling shares, and thereafter defendants acquired the shares and sold them to the agent at a profit. The object of the purchaser was to obtain the land. In holding that defendants must account for their secret profits, the court said (p. 79) : ''It is quite true that the profits in the present case were made to appear on the surface as not coming from the sale of the property of the corporation; but, as all the facts show that the purchaser only wanted the real estate, and not the control of the franchise of the corporation, there is little or no doubt that the profits paid to the two defendants were considered by the purchaser as part of the cost of the real estate. . . . The conclusions of the court below were reached, and are here sustained, on the peculiar facts in this case, *with a full and express recognition of the general rule that a stockholder, even though he be one of the managing officers of a corporation, has the right to buy and sell its stock and to keep any profits which he may thus acquire.* But the corporation officers *cannot under cover of this rule carry through a transaction such as appears in this case without accounting for profits thereby diverted from their corporation.*''

■ The second fundamental reason which makes the protection of the majority rule unavailable is that this is not a case of mere nondisclosure, but of *suppression* of facts and *active misrepresentations.* Appellants have assumed, in their assertion of the doctrine that the director owed no duty of disclosure here, that the only fraud charged was constructive nondisclosure by a fiduciary. In fact, the evidence established and the court found actual fraud. Kruse and his associates did not merely solicit these transactions without making any representations about their nature. On the contrary, they made or authorized a great many statements, to the directors, to the stockholders, and to the insurance commissioner; and in every important instance their description of the transaction was false. Kruse related the details of the deal to his board, and failed to tell all of the details; he spoke of options, knowing that these were in reality repurchase agreements; he authorized applications to the insurance commissioner which did not tell all the facts; and permitted the corporation books and financial statements to falsely repre-

sent the actual condition of its finances, and its commitments and liabilities. Tucker described the deal to his board without telling the whole truth, and permitted the secretary of Western to state to the stockholders that the complete terms of the offer were set forth in the general letter, knowing that this was not true, and that in fact the Western stockholders who subscribed to the new issue of stock were coming into a company with a concealed liability of $1,400,00, 80 per cent of the amount of paid-up capital ($1,750,000) represented in the general offer.

This is actual fraud. Regardless of whether one is under a duty to speak or disclose facts, one who does speak must speak the whole truth, and not by partial suppression or concealment make the utterance untruthful and misleading. This doctrine is declared by our Civil Code (sec. 1710, subd. 3), and is everywhere recognized as a sound rule of law. (See Harper on Torts, sec. 219; *Sullivan* v. *Helbing,* 66 Cal. App. 478 [226 Pac. 803].) For example, in *Sullivan* v. *Helbing, supra,* where the parties were negotiating for an exchange of real property, defendants stated that their property was under lease for a rental of $155 per month. They failed to disclose the fact that they were regularly accepting a lesser sum from the tenant. The court held that the representation, though literally true, was actually rendered deceptive and fraudulent by the concealment. The very cases which lay down the majority rule on lack of a duty of disclosure on the part of a director recognize the clear difference between mere nondisclosure of personal knowledge, and concealment or misrepresentation; and all concede that the latter is actionable. (See the cases cited above, and 3 Fletcher, Corporations (Perm. Ed.), sec. 1172; Stevens, Corporations, sec. 145; 13 Am. Jur., sec. 1011; note, 45 Harv. L. Rev. 1078.)

 The final distinction is that this is not merely a case of fraud between two parties to a transaction, whereby one was induced to act or enter into it by the fraud of the other. The transaction herein involves an *agreement* between several parties to defraud others. The plan of operation involved misrepresentation of the actual deal to the stockholders of Western. The representation that the general offer was the complete offer was deliberately made to induce them to come in; and a number of stockholders, including some direc-

tors and officers, testified that they relied on these representations and the apparent fact that the four large stockholders were accepting the same offer. This evidence was overwhelming, and the court so found, as above stated.

The evidence and findings bring the case within the general principle that an *agreement to defraud third persons* is illegal and void. (See, generally, 6 Williston on Contracts (Rev. Ed.), sec. 1738, p. 4912, collecting the authorities; *Bacciocco* v. *Transamerica Corp.* 2 Cal. App. (2d) 595 [38 Pac. (2d) 417]; *Clifton* v. *Tomb*, 21 Fed. (2d) 893, 900.)

Other defenses raised by appellants on the issue of fraud, only two of which require discussion, are equally unsound.

The first one is that California-Western, the combined company, is the wrong party to sue for the fraud on Western stockholders. The assumption here is that the only fraud was in paying the four favored stockholders a higher price, in effect, than the other stockholders, to the injury of the stockholders who get less than they were entitled to. This is a misconception of the situation. The general offer was entirely fair and proper, and the general transaction, with the exception of the repurchase agreements, was approved by all, including the insurance commissioner. The Western stockholders were not entitled to any more; the favored four merely received too much, and the payments made under the repurchase agreements came from the combined company, California-Western, the assets of both of the original companies being used to raise the money. This part of the fraud consisted in fastening upon California-Western an unwarranted liability, and it was the corporation as such, and not the individual stockholders, who suffered the injury. It is true that some of the misrepresentations were to the stockholders generally, but others were to the directors of the two corporations. And regardless of whether the actual misstatements were made to individuals or to the directors acting for the corporation, all the misstatements were made for the purpose of *accomplishing the transfer of assets,* and concurrently fastening the secret liability *upon the combined company to be formed.* The objection that the combined company cannot sue is therefore without any force: The representations were intended to *induce action by that company.* The governing rule in such a situation was fully discussed by this court in *Crystal Pier Amusement Co.* v. *Cannan,* 219 Cal. 184 [25 Pac. (2d) 839, 91 A. L. R. 1357], where

false representations concerning construction materials were made to officers of a corporation, which in reliance upon them built an amusement pier. Later the same individuals organized another corporation to build structures on the pier. It was held that the second corporation could sue for the fraud, notwithstanding the fact that it was not in existence at the time the representations were made. The court, upon a full review of the authorities, concluded that fraud, to be actionable, need not consist of representations made directly to the parties seeking recovery; but that representations made to one person, with the intention that they reach another and be relied upon by him, are actionable by that other.

 It should be noted that in the foregoing case there was not even an assignment of rights by the first corporation to the second. In the instant case, the agreement of sale and reinsurance assigned to California-Western all choses in action of Western. It is, of course, well settled in California that the right to recover money or property obtained by fraud may be thus assigned. (*Jackson* v. *Deauville Holding Co.*, 219 Cal. 498 [27 Pac. (2d) 643]; see, also, *Crystal Pier Amusement Co.* v. *Cannan, supra,* p. 187.) It should further be noted that we hereinafter hold this transaction to constitute a fraud on the policyholders of the combined company, and it seems obvious that the corporation must be the proper party to sue in their behalf.

 The other contention is that there was no fraud because there was no discriminatory treatment of the Western shareholders; that the four large shareholders got no better bargain but only a different one, and that it was Kruse who wanted the right to repurchase, instead of the four shareholders who wanted the right to resell. It is sufficient to point out that all the evidence is against this interpretation, and the record shows clearly, as the court found, that the agreements were a condition insisted on by the four large shareholders. It was all to their advantage, for the price was higher than the then market value. If the stock went down they were protected; if they believed it would go up they could simply buy more shares in the market (or subscribe to some of the new issue). In other words, they could subscribe to new stock at $40 per share, holding meanwhile the contract of California to repurchase the other stock held by them at $60 per share. And that is, in truth, what they did;

they all subscribed to their allotted new shares at $40, and Pacific American Company immediately resold its new shares at a $2 profit.

There is finally, a much graver fraud committed in this case than that hereinbefore discussed, namely, the fraud on the policyholders of the companies. A life insurance company is something more than an ordinary business corporation, and its policyholders are not ordinary creditors. The directors of such a corporation cannot say that they owe fiduciary duties only to the corporate entity as such. The statutes of this state and the states generally contain the most positive assertion of duties owed to policyholders, and declare in unmistakable terms the public policy of this state to protect them from any such abuses by those entrusted with the management of their companies. The insurance commissioner, as their representative, is charged with the duty of regularly scrutinizing the financial affairs of the corporation, and of approving or rejecting plans for the issuance of stock, or the purchase of assets. (See Vance on Insurance, 2d ed., p. 29.) In such a crucial change as the complete absorption of one company by another, it is of the highest importance that the commissioner be possessed of all facts concerning the assets and liabilities involved, and the law expressly requires the presentation of those facts to him, and his approval, before such action may be taken.

The instant case exhibits a course of fraudulent misstatement and concealment in reports, books, and records of the company, designed to procure the approval of the transaction by the commissioner, and ultimately succeeding in that object. As a result of the fraud, the commissioner unknowingly approved a deal involving a secret liability which impaired the capital of the company and seriously threatened the interests of its policyholders. Kruse admitted this danger in his letter to Lochead in 1933; the court below so found; and the fact that in 1933, despite the unexpected restoration by King of his share of the repurchase money and commissions, the company was compelled to reduce its capital from $1,750,000 to $875,000 to avoid a deficit, speaks for itself. The witness Rouble, chief examiner of the insurance commissioner, testified that if the repurchase agreements were known, and taken into consideration, the company's reserves would have been deficient in 1931. Instead, the report of the com-

missioner in 1932 showed a surplus of $1,000,000 which the $1,400,000 secret liability would have changed into a showing of impaired capital.

The fact that this condition no longer exists today, and that the corporation is today financially sound, is, of course, no defense for the appellants.

It is our conclusion, therefore, that the judgment of the trial court herein was correct, and it is hereby affirmed.

Gibson, J., Shenk, J., Curtis, J., Goodell, J., *pro tem.*, Edmonds, J. and Waste, C. J., concurred.