(No. 7172. May 18, 1945.)

HOWARD C. FOX, Executor of the Last Will and Testament of J. C. Fox, Deceased, Respondent, v. W. E. COSGRIFF, C. L. MILLER and OSCAR E. THAMM, Appellants.

[159 Pac. (2d) 224.]
Rehearing denied June 11, 1945.

James & James for appellants.

Chapman & Chapman and James T. Murphy for respondent.

BUDGE, J.—This is an action for fraud. Respondent, as executor of the Last Will and Testament of J. C. Fox, deceased, seeks to have rescinded and set aside the sale of 35 shares of the capital stock of the Hailey National Bank by him, as such executor, sold and delivered to appellants.

This case was before this court on a former appeal (*Fox v. Cosgriff et al,* 64 Ida. 448, 133 P. (2d) 930,) wherein respondent Fox was appellant, and Cosgriff et al, were respondents. The sole and only question involved in the former appeal was whether the court below erred in sustaining respondents' general and special demurrers to appellant's third amended complaint. The case is here now on the merits. For brevity, we will refer to the third amended complaint as the complaint throughout this opinion.

It may not be out of order at this time to identify the parties to the action and their relationship to each other:

W. E. Cosgriff was president and director of the Hailey
National Bank. C. L. Miller was president of the First
National Bank of Caldwell and vice-president and director
of the Hailey National Bank. O. L. Thornock was cashier
of the First National Bank of Caldwell. Oscar E. Thamm
was a director and cashier of the Hailey National Bank.
Charles F. Price was president of the Commercial National
Bank of St. Anthony.

W. E. Cosgriff and his immediate family were the ma-
jority stockholders of the three banks above mentioned,
and it might be fairly said that the banks were under Cos-
griff's control and supervision.

The action was tried in the District Court of the Fourth
Judicial District, resulting in a judgment in favor of re-
spondent rescinding the sale of the 35 shares of capital
stock of the Hailey National Bank, and entering judgment
against appellants, Cosgriff and Miller, for the amount of
the dividends received by them in excess of $100 per share,
the par value of the stock, together with interest on such
dividends from the time each was paid. This appeal is
from the judgment so entered.

Appellants rely on three assignments of error. The
third assignment is divided into 16 subdivisions, but as
stated in respondent's brief, the only question for considera-
tion and decision is whether the allegations of the complaint
are supported by any substantial competent evidence. Or,
as otherwise stated in appellants' reply brief, the only ques-
tion is whether the evidence is sufficient to sustain the
judgment and whether or not the findings of fact are sup-
ported by the evidence.

The record discloses there were two banks in Hailey,
the First Security Bank and the Hailey National Bank;
that Hailey is a relatively small community; that there was
not sufficient business to justify two banks. Negotiations
were carried on over a considerable period of time by the
officials of the two banks with the object in view of their
consolidation. In other words, the Hailey National Bank
was to become the purchaser of the First Security Bank,
or the First Security Bank was to become the purchaser
of the Hailey National Bank. The final outcome resulted
in the First Security Corporation purchasing approximately
one-third of the assets of the Hailey National Bank, the

balance of the assets of said bank were to be, and were, liquidated by the officers of the Hailey National Bank.

Respondent's father, Dr. J. C. Fox, was one of the original incorporators of the Hailey National Bank, and for a time its president and director, and owned 35 shares of the capital stock of said bank. Respondent is the executor of his deceased father's last will and testament and, as such executor, acquired possession of the 35 shares of capital stock of the Hailey National Bank and in order to close up the estate he was desirous of selling said shares, to that end he sought a market for the stock. As a result of a conversation which was had, at respondent's request, between Thamm, director and cashier of the Hailey National Bank, and Aileen Fox, wife of respondent, in which conversation Thamm suggested that either Cosgriff or Miller might be interested in purchasing the stock, on January 13, 1939, respondent wrote a letter each to Cosgriff and Miller, substantially as follows:

"As you no doubt know, my late Father, J. C. Fox owned thirty five shares of the Hailey Nat'l Bank stock. In his will he instructed that his estate be divided among us four children. Since this is the case it is my thought you may know of a market for these shares.

"Of course we could divide this stock up equally between us but I thought before doing so, I would try to find a purchaser.

"I would appreciate hearing from you."

The substance of the conversation between Mrs. Fox and Thamm was telephoned by respondent to his brother, Dr. E. W. Fox, who resided at Hailey, accompanied with a request by respondent that his brother should call at the bank, investigate and ascertain the value of the stock. Dr. Fox called at the bank and had a conversation with Mr. Thamm, its director and cashier, in part, as follows:

"* * * I told Oscar (Thamm) that I had received a telephone call from my brother Howard (respondent) * * * and that my brother had asked me to come over and ask him what he considered a good price for that stock (bank stock) and Oscar stated at that time he didn't know, but he would let me know in a few minutes, that Mr. Miller and Mr. Cosgriff were here, and he would go back and talk to

them. * * * He left me, and pretty soon he came back, and told me that the par value would be a good price for the bank stock."

Referring to the letter that was written to Miller and opened by Thornock, cashier of the First National Bank of Caldwell, and who, upon opening the letter and ascertaining its contents, telephoned the contents of the letter to Miller at Hailey, Miller instructed Thornock to get in touch with respondent and tell him that he, Miller, was willing to pay $100 per share for the stock, which Thornock did by calling respondent on the telephone at Idaho Falls. As a result of the conversation had between Thornock and respondent, and a conversation with Price at St. Anthony, respondent went to St. Anthony and met Price at the bank. Twenty-five shares of the stock involved had been hypothecated by respondent's father to secure a loan from the Continental National Bank at Salt Lake, a Cosgriff bank. Price had this stock and respondent had the remaining ten shares. The following questions were asked respondent, to which he made the following answers:

"Q. And what, if any, conversation did you have with Mr. Price at that time?

"A. When I arrived at the bank it was a little after three o'clock and the doors were closed, but as a customer came out I walked in and immediately asked for Mr. Price and introduced myself, and Mr. Price told me that he didn't have the necessary papers quite ready, that if I would just wait for a little while he would have them ready, and while he was preparing those I asked him, 'What is the rush about selling these shares? Why do they need the shares so bad?' and he said that he really didn't know, and I says 'Do you suppose they are going to have a meeting and that they want to elect somebody president and they need thirty-five shares, or what?' and he said, 'That might possibly be it,' and I also asked him if he thought that the par value offer of $100.00 was a fair offer for the stock, and he told me that in his opinion it was, that Hailey had two banks, that they no longer made the profits they used to make, that while they were in good sound financial condition, he saw no reason why the stock should be of greater value.

"Q. At that time did he submit to you any transfers or assignments to be executed by you?

"A. Yes, sir, he did.

"Q. And did you bring with you there any of the stock?

"A. I did.

"Q. What stock did you bring with you?

"A. Ten shares.

"Q. And that was the ten shares that were in the safety deposit box at Hailey at the time of your father's death?

"A. That is correct.

\* \* \* \*

"Q. And I will ask you whether or not at that time you were paid $100.00 per share for the stock by Mr. Price?

"A. I was \* \* \*."

It is further disclosed, from the testimony of Price, that on January 14, 1939, Miller called Price on the telephone and told him to buy the J. C. Fox stock if Howard Fox called at the bank, and to pay him par value, and deduct therefrom the amount of the Salt Lake note. Price informed respondent he had had a conversation with Miller, and Miller told him to pay $100 a share for the stock. Naturally, Price would make no other answer than he did, that in his opinion he (Fox) was receiving a fair value for the stock.

A. W. Ensign, a witness called on behalf of respondent, among other things, testified that he had been a stockholder of the Hailey National Bank; that following the sale of the Hailey National Bank to the First Security Corporation he had a conversation with Thamm with regard to the sale and purchase of the Fox stock by Cosgriff and Miller, in which conversation Thamm stated that when Dr. Fox called at the bank and was trying to get an idea of the value of the stock that both Miller and Cosgriff told him (Thamm) that it was worth $100 per share, "and I says, 'Why didn't you tell him what the book value was?'"

It will be recalled that when Dr. Fox inquired of Thamm as to the value of the stock, Thamm said he did not know what the value was, but that Mr. Cosgriff and Mr. Miller were in the bank and he would ask them. Upon his return he stated to Dr. Fox "that the par value would be a good price for the bank stock."

It is strenuously contended by appellants that there is no evidence to show that Cosgriff, Miller and Thamm conspired together to wrongfully, unlawfully and fraudulently purchase the Fox stock. The jury, in answer to interrogatory No. 8, specifically found that appellants did conspire to misrepresent to respondent the value of the Fox stock in order to deceive him as to its value. In answer to interrogatory No. 7 the jury found that at the time appellants made such misrepresentations they knew they were untrue, and that they made them with intent to deceive the plaintiff of the true value of the stock. The jury found, in answer to interrogatory No. 4, that the approximate value of the stock was $148.93, and in answer to interrogatory No. 5 of the jury found that those who made the above false representations knew at the time they made them that the stock was worth in excess of $100 per share.

It further appears that on the 21st day of January, 1939, the First Security Corporation took over the assets acquired by it from the Hailey National Bank, and on that day a dividend of $100 a share was declared by the directors of the Hailey National Bank and paid to its stockholders. Subsequent payments of dividends were made, and on December 26, 1939, the final dividend was paid, totaling in all $186.82.

A reading of the record carries conviction to one's mind that Thamm, Cosgriff and Miller each knew practically the intrinsic value of the stock, and that each knew its intrinsic value was far in excess of $100 per share.

Thamm testified that on January 14, 1939, the day he had the conversation with Dr. Fox, the book value of the stock was $148.93. Negotiations had been carried on for a considerable length of time between Cosgriff and a representative of the First Security Corporation looking to the consolidation of the two banks. Naturally, Cosgriff and Miller had knowledge of the intrinsic value of the stock of the Hailey National Bank, its assets and liabilities, and its net worth. We are of the opinion that the record supports the above statement. As business men they knew, and must have known, that $100 per share for the stock was not its reasonable value, and when they, through Thamm, director and cashier, made the statement that the reasonable value of the stock was par value, they knew the statement was false and untrue, and in making the statement they did

not express an opinion as to the reasonable value of the stock, but a statement of a material fact knowingly, intentionally and fraudulently for the purpose of deceiving and misleading respondent to his damage, and did so mislead him. (*Moon v. Benton* (Ala.), 68 So. 589, 592.) Neither can it be logically contended that a statement as to value is never a material fact. (*Handy v. Waldron* (R.I.), 49 Am. St. Rep. 794.) Where actual value is known and false statements are knowingly made with intention to deceive, and do deceive the parties to whom they are made, such statements constitute actionable fraud. Such statements are not expressions of opinion but are statements of material facts. (23 Am. Jur. sec 32, note 16, p. 790; *Van Dah Dunshee v. Broadway* (Cal.), 7 P. (2d) 325.)

In discussing the case last above cited, the court used the following language:

"Under such circumstances there statements regarding the value of the property are definite assertions of fact, and not mere expressions of opinion. * * * a false statement regarding the value of property, which is not made in good faith, and which is not warranted by the knowledge or belief of the owner, may furnish the basis of an action for rescission on the ground of fraud or deceit." (To the same effect see *Phelps v. Grady* (Cal.), 141 P. 926.)

Whether such representation was an expression of an opinion or an affirmation of a fact is a question for the jury. (*Olston v. Oregon Water Power & Ry. Co.* (Ore.), 96 P. 1095.) In the case last cited, quoting from 20 Cyc. 18, the following language is found:

" 'An expression of opinion may be so blended with statements of fact as to become itself a statement of fact. Where one of the parties has superior knowledge on the subject, his expression of an opinion which he knows he does not entertain because it is contrary to the facts may be actionable if made for the purpose of inducing another to act upon it, which he does to his injury.' To the same effect is 14 Am. & Eng. Ency. Law, 35. In an English case (*Smith v. Land & House Prop. Corp.* 28 Ch. Div. 7, 15). in discussing this question, it is said: 'It is material to observe that it is often fallaciously assumed that a statement of opinion cannot involve the statement of a fact. * * * But if the facts are not equally known to both sides, then a statement of

opinion by the one who knows the facts best involves very often a statement of a material fact, for he impliedly states that he knows facts which justify his opinion.' In *Stebbins v. Eddy*, 4 *Mason* (U.S.) 414, 423 Fed. Case. No. 13,342, the court says: 'It has been suggested at the bar that fraud cannot be predicated of belief, but only of facts; but this distinction is quite too subtle and refined. The affirmation of belief is an affirmation of a fact—that is, of the fact of belief—and if it is fraudulently made to mislead or cheat another, to abuse his confidence, or to blind his judgment, it is in law and morals just as reprehensible as if any other fact were affirmed for the like purpose. The law looks, not to the nature of the fact averred, but to the object and design of the affirmation.' In *People v. Peckens*, 153 (N.Y.), 576, 591, 47 N. E. 883, 887, Mr. Justice Martin says: ' * * * *As a general rule, the mere expression of an opinion, which is understood to be only an opinion, does not render a person expressing it liable for fraud; but where the statements are as to value or quality, and are made by a person knowing them to be untrue, with an intent to deceive and mislead the one to whom they are made, and he is thus induced to forebear making inquiries which he otherwise would, they may amount to an affirmation of fact rendering him liable therefor.'* " (Emphasis supplied.)

 It may be generally agreed that the relation of officers and directors concerning the affairs of the corporation is fiduciary in character. There is, however, a conflict of opinion as to whether such a relationship exists between them and the individual stockholders. The weight of authority is seemingly in conflict and is to the effect that officers and directors do not sustain any fiduciary relation to individual stockholders with respect to their holdings of stock, and may deal with them and purchase their stock practically on the same basis as strangers, *and in the absence of actual fraudulent representations or concealment a purchase so effected will not be invalid for a mere failure to disclose any information the directors may have affecting the value of the stock so purchased.* (*Dawson v. National Life Ins. Co.*, Ann Cas. 1918B, note at p. 242.)

However, there are exceptions to the above rule, and the facts of the instant case bring it within the exceptions.

 By reason of the existence of special circum-

stances a fiduciary duty may exist so as to grant an exception to the general rule, and impose upon an officer or director the duty of disclosing information possessed by him which might affect the value of the stock he seeks to purchase. When Dr. Fox interviewed Director Thamm to ascertain the value of the stock, it is apparent he relied on Thamm and placed implicit confidence in the statements Thamm made to him. Relied on them and communicated them to his brother, who also relied and acted upon the statements made by Director Thamm, which statements were not true and were made under instructions received, as we read the record, from Cosgriff and Miller, who had been appointed as a committee to dispose of the assets of the Hailey National Bank to the First Security Corporation, and to wind up the business of the corporation, and they had knowledge, necessarily, of the intrinsic value of the stock. Under such circumstances the relationship existing, and confidence reposed in Thamm by Dr. Fox and respondent it was the duty of appellants, and particularly Thamm, as director and cashier, to disclose the fact that the bank was being liquidated, or in the course of negotiations looking to its liquidation which, if consummated, would result in enhancing the value of the stock. The transaction and the means employed were such that it cannot logically be contended there was no actionable fraud.

The assignment of the stock was in blank, made no doubt for the purpose of concealing the identity of the purchasers. Respondent was ignorant in regard to the negotiations for the sale of the assets of the bank, which negotiations and probable result were material facts affecting the value of the stock. It is fair to assume that respondent would not have sold the shares at the price he did had he known the actual state of the negotiations.

We can reach no other conclusion, under the facts of this case, than that appellants' wrongful failure to disclose the negotiations looking to the winding up of the bank's business, and the further fact that they avoided identity in the purchase of the stock; the fact that on the day the First Security Corporation acquired the assets of the Hailey National Bank a dividend of $100 a share was declared by the directors; the fact that appellants were the owners of far in excess of a majority of the stock and were in absolute control; the rapid communication by which word was sent

to the representatives of appellants in connection with the purchase of the stock; the fact that it was immediately forwarded from Salt Lake to St. Anthony where respondent received practically the same information from Price that Thamm had given his brother at Hailey, all of which transactions took place from the 14th to the 16th of January, 1939; and other badges of fraud not here enumerated, all pointing to the fact that appellants studiously undertook to protect themselves against misrepresentations, or such misrepresentations as they thought necessary to constitute fraud.

The law would indeed be impotent, in view of all the facts disclosed by the record, if recovery should be denied. (*American Trust Co. v. California W. States Life Ins. Co.* (Cal.), 98 P. (2d) 497 at 504; *Stewart v. Harris* (Kan.), 77 P. 277.)

█ Appellants had information that Fox did not have, and was not obtainable by him, and the parties did not deal on equal terms, but respondent relied implicitly on the representations made by appellants, speaking through their employees and representatives, and acted thereon and was deceived thereby to his damage. The rule is stated in 26 C. J. 1219, as follows:

"If the parties deal upon unequal terms the rule that misrepresentations of value are nonactionable expressions of opinion does not apply, and under such circumstances they will constitute remediable fraud, as where the facts are peculiarly within the knowledge of the speaker and difficult for the hearer to ascertain."

There are many authorities cited in the briefs of counsel. To discuss them or cite them would serve no useful purpose, since the facts are not parallel to the facts in the instant case.

█ We are satisfied from a careful study of the record that the judgment entered is supported by the evidence, and that there is sufficient competent evidence to support the court's findings. It therefore follows that the judgment must be affirmed, and it is so ordered. Costs to respondent.

Ailshie, C.J., and Givens, Holden and Miller, JJ., concur.