[L. A. No. 15090. In Bank.—June 27, 1935.]

IONE C. BELLON, Respondent, v. SILVER GATE
THEATRES, INC. (a Corporation), Appellant.

4 

Wright, Monroe, Thomas & Glenn for Appellant.

Stearns, Luce & Forward for Respondent.

PRESTON, J.—This action was instituted by respondent against appellant and others to recover damages for the death of her husband, Raymond C. Bellon, who was killed on April 4, 1932, while doing plumbing work in the basement of the Balboa building in the city of San Diego. The appellant is the lessee of the entire building. Located in the building are a theater, stores, offices and several basements. Several persons or corporations were originally joined as defendants, but the action was dismissed as to one, a non-suit granted as to two, and a motion for directed verdict granted as to three. A verdict was returned by the jury against the sole remaining defendant, appellant herein, in the sum of $20,000.

The deceased was a plumber. At the time of his death, he was engaged in cleaning out an obstructed drain pipe located in the basement of the Balboa building. In performing this task, he was using an implement commonly used by plumbers for such purposes, known as a ''plumber's snake'', which is a flexible spring steel tape about 60 feet long. While using this tape, one end of it came into contact with a defectively insulated electric drop cord, admittedly maintained in the basement in an unsafe condition and in a manner in violation of a city ordinance. Bellon was standing in a shallow pool of water and, as a result of the electric shock, was instantly killed. The main question involved on this appeal is whether or not appellant, under the facts disclosed by the record, owed a duty to Bellon to maintain the basement, in general, and the electric drop cord, in particular, in a reasonably safe condition. The solution of this problem largely turns upon whether the basement where the injury occurred was under the legal control of appellant, as landlord, or under the legal control of the tenants who had leased the stores above.

The Balboa building is located at the southwest corner of Fourth and E Streets in the city of San Diego. The fee

of the property is in the Balboa Building Company and the building is leased to appellant. Both the Balboa Building Company and appellant are wholly owned subsidiaries of the Fox West Coast Theatres Corporation. The building is several stories in height. The main portion of the building is occupied by the Balboa Theatre, the entrance to which is at the corner of Fourth and E Streets. To the south of the theater entrance, and facing Fourth Street, on the first or ground floor of the building, are certain stores. Above the stores are offices. The stores and offices are all leased to separate tenants. At the time of the death of Bellon, appellant had leased the first store adjoining the theater entrance to Mrs. Walsh, who conducted a confectionary there under the name of the "Sweet Shop", her son, J. C. Milne, acting as manager. The street number of the Sweet Shop is 866 Fourth Street. Next, adjoining the Sweet Shop, is a restaurant, occupying two stores and leased to Harding and Calvert. Adjoining the restaurant is the lobby of the Balboa building, serving as an entrance to the offices located above the stores. In the lobby is located an elevator. Underneath the lobby, restaurant and Sweet Shop are four basement rooms, each exactly the same in size as the room above, except that each basement room extends under the sidewalk to the curb line of Fourth Street. Access to the basement room underneath the lobby is had by means of the elevator. Under the restaurant are two basement rooms, divided by a partition, but with an open archway leading from one to the other. There is also a doorway between the lobby basement and the adjoining restaurant basement. The basement under the Sweet Shop, as originally constructed, had no access to any other basement room, the only means of access being by a trap door in the floor of the Sweet Shop and an iron stairway located in the basement. A prior tenant of the Sweet Shop who was in possession during 1925–1929 testified that she had no use for this basement and had covered the entire floor of the Sweet Shop, including the trap door, with linoleum, and had erected a semipermanent structure in the Sweet Shop over the trap door. Mrs. Walsh, when she took possession, placed new linoleum on the floor and also installed a fixture over the trap door. As a result of these acts the basement under the Sweet Shop was left without any means of ingress or egress.

Some time between 1925–1929 someone knocked a hole in the partition dividing the restaurant basement from the basement under the Sweet Shop. This hole was about 2½ feet square, its base being several feet from the basement floor. This hole was in the wall when the Sweet Shop was leased to Mrs. Walsh, August 24, 1931. After this hole was put in the wall it was possible to enter the basement under the Sweet Shop by first entering the lobby basement, then crossing the two restaurant basements, and then crawling through the hole above described. In fact, after the trap door was closed, this was the only means of ingress to this room.

Crossing the basement room under the Sweet Shop, near the ceiling thereof, are certain exposed steam pipes serving the building generally. In the partition dividing the Sweet Shop from the restaurant is a drain pipe which serves the various offices above, and the restaurant. This drain pipe comes down the partition and into the basement, then crosses the two restaurant basements, and then connects with the main line leading to the sewer. This drain pipe is not exposed in the room under the Sweet Shop, but near the ceiling and in that room is a small hole in the partition, through which a clean-out plug in the drain pipe can be reached. In the restaurant basements are other clean-out plugs.

In a corner of the basement under the Sweet Shop there was installed during the tenancy of Mrs. Walsh, in October, 1913, a carbonating machine, attached by pipes to the soda fountain directly above in the Sweet Shop. This machine was installed by one Howerton, a contractor. He placed this machine in the basement on his own responsibility. Neither Mrs. Walsh nor the appellant gave him express permission to use the basement for this purpose. In order to get the carbonating machine into the basement, he enlarged the hole in the partition above described. The carbonating machine was operated by electricity. The current was obtained through two heavily and properly insulated wires which ran from the motor on the machine to an outlet box located in the ceiling of this basement room. The switch operating the machine was located in the Sweet Shop. A short distance from the ceiling the insulation had been cut from each of the wires leading to the motor, and an electric

drop cord attached thereto, on the other end of which was a socket for a light globe. This drop cord was quite long, and was looped several times around the steam pipes, and hung, in a loose loop, to within a short distance from the floor of the basement. The cord was an old one, being at least three or four years old, and the insulation on it was badly worn, in several places being entirely worn off and the wire exposed. It is an admitted fact that this drop cord was maintained in a negligent condition and in a manner in violation of a city ordinance. There was some evidence that a similar cord was present in the basement under the Sweet Shop prior to October of 1931, when the carbonating machine was installed. The record is silent as to who connected, or authorized the connection of the drop cord in the fashion above described, everyone connected with this case denying responsibility therefor.

On April 4, 1932, the drain pipe above described became obstructed, resulting in the accumulation of a large pool of water about ½ inch deep in one of the restaurant basements. The evidence shows that three telephone calls were made to the plumbing establishment where deceased was employed, requesting that a plumber be sent to clean out the drain pipe. One of these calls was made by the janitor of the Balboa building, an employee of an independent contractor. At the coroner's inquest, the janitor testified unequivocally that Mr. Kendrick, the manager of appellant, requested him to call the plumber. At the trial he changed this story and testified that Mr. Bassett, one of the proprietors of the restaurant, requested him to call the plumber. The Balboa plumbing shop, owned by the decedent's father, and for which decedent worked, had previously done considerable work at the Balboa building. This work had been ordered and paid for by appellant or its agents. Mrs. Bellon, mother of the deceased, and in charge of telephone calls at the plumbing shop, testified that one of the three calls was from Mr. Kendrick; that the man telephoning stated he was Mr. Kendrick; that on previous occasions someone stating that he was Mr. Kendrick had telephoned for plumbing service. Kendrick denied that he had telephoned or authorized a telephone call to the plumbing shop on April 4th, and likewise denied making the prior calls. Though there is some uncertainty as to who made or authorized the tele-

phone calls, it is certain that no one connected with the Sweet Shop ordered the plumbing work to be done.

The deceased responded to the request for a plumber. He was apparently first observed by the janitor of the building. When first observed, Bellon was standing on a stepladder belonging to the building, in the basement under the Sweet Shop. He had removed the clean-out plug in the drain pipe located in that room, as above described, and had inserted the plumber's snake into the drain pipe. The janitor informed Bellon of the existence of the other clean-out plugs in the restaurant basement and pointed out one located in the basement room adjoining the lobby basement. The janitor then left. It was in this last-named basement room that the pool of water had accumulated. A short time later, Bellon was found lying on the floor of this room. One end of the plumber's snake was inserted in the drain pipe where the clean-out plug in that room had been removed. Bellon was holding the plumber's snake in one hand. The steel tape led from this room, through the adjoining restaurant basement and through the hole in the partition separating the restaurant basement from the basement under the Sweet Shop. The free end was found to be in contact with the defectively insulated drop cord. Apparently, when Bellon went into the restaurant basement, he had carried one end of the tape through the hole in the wall, then through the adjoining basement room and into the room where he was found. Apparently while inserting the tape in the clean-out plug, the free end thrashed about and came into contact with the drop cord. Inasmuch as Bellon was then standing in water, the force of the shock was intensified and he was electrocuted.

■ This action, brought by the widow of deceased, is predicated upon the theory that Bellon was an invitee; that appellant owed Bellon a duty of due care; and that appellant was negligent in permitting the defective drop cord to be maintained upon the premises. Appellant concedes that the wiring was defective and that the evidence is sufficient to establish negligence on the part of someone in the maintenance of the drop cord, but strenuously contends that it owed no duty to appellant and that it was not negligent. It is appellant's theory that possession and control of the

basement under the Sweet Shop passed under the lease of the Sweet Shop to Mrs. Walsh; that appellant had neither possession nor control of this basement room; that the premises were in a safe condition when leased to Mrs. Walsh; that it did not install nor know of the installation of the drop cord; that Mrs. Walsh was in exclusive possession and control of the basement under her shop; and that, therefore, it owed no duty to appellant. Mrs. Walsh was not made a party to this action. Respondent argues that whether the right to the possession and control of the basement passed under the lease to Mrs. Walsh, or whether the right to possession and control was retained by the appellant as landlord, under the facts of this case, was a question of fact for the jury, and that that question has been determined in respondent's favor by the verdict.

We are of the opinion that respondent's position is sound. In the lease to Mrs. Walsh, the property demised was described as ''Those certain premises more particularly known and described as 866 Fourth Street, situate in the Balboa Building.'' The basement is not referred to in the lease. Under the terms of the lease, the tenant agreed to make all necessary repairs ''on the premises'' leased. The landlord, however, retained a right of entry to the ''premises'' leased for the purpose of making certain repairs. The evidence shows that there were certain stores in the building, other than the ones described above, and that these other stores had no basements under them. In the leases to the tenants of these other stores, the demised property was described in the same fashion as it was described in the Walsh lease. The word ''premises'', as used in the Walsh lease, is of no particular assistance in determining whether or not the basement passed under the lease. Whether such term was intended to include the basement turns upon the surrounding facts and circumstances. (*Cohen* v. *Strauss*, 139 N. Y. Supp. 929; *Hirsh* v. *Valloft*, 121 La. 66 [46 So. 103]; *Robinson* v. *State*, 143 Miss. 247 [108 So. 903].)

Both parties to this appeal cite and rely upon the case of *Runyon* v. *City of Los Angeles*, 40 Cal. App. 383 [180 Pac. 837, 839], and both agree that it correctly states the principles determinative to this appeal, but differ as to the application of those principles to the facts of this case. In that case, a barber shop on the first floor of a building was

leased to Cooley under a lease describing the premises as "That certain store room known and numbered 212 West First Street . . . " Under the barber shop was a basement. A third party, the plaintiff, was injured by reason of a defective grating leading to the basement. This condition did not exist when the premises were leased. When the lease was entered into the agent of the owners told Cooley that the basement was included and gave him a key to the door leading to the basement. A directed verdict was granted as to the owners of the building on the theory that the basement passed under the lease to Cooley. An appeal was taken on a bill of exceptions containing only a portion of the evidence. As a result, the appellate court held that it was bound "to resolve every material question of fact against appellants." All that remained to determine was whether as a *matter of law,* under the above description, the basement was excluded from the lease. In effect, the court held that this was a question of fact and, therefore, must be determined in favor of respondent owner. During the course of its opinion, the appellate court stated (p. 387 [40 Cal. App.]) :

"The written lease does not expressly mention the basement under Cooley's barber-shop. The language of the lease is: 'That certain storeroom known and numbered as 212 West First Street, . . . said storeroom hereby leased being the room now occupied by the party of the second part. . . . The said storeroom is to be used by the party of the second part for the purpose of conducting a barber-shop therein, for which said purpose it is now occupied by the party of the second part.' A lease of a part of a building passes with it, as an incident thereto, everything necessarily used with or reasonably necessary to the enjoyment of the part demised. (*Miller* v. *Fitzgerald Dry Goods Co.,* 62 Neb. 270 [86 N. W. 1078] ; *Kitchen Bros. Hotel Co.* v. *Philbin,* 2 Neb. (Unof.) 340 [96 N. W. 487] ; *Herpolsheimer* v. *Funke,* 1 Neb. (Unof.) 471 [95 N. W. 688].) The general rule is that where a store is leased, everything then in use for the store, as an incident or appurtenance, passes by the lease. (*Hall* v. *Irvin,* 78 App. Div. 107 [79 N. Y. Supp. 614] ; *Broning* v. *Dalesme,* 3 Sandf. (N. Y.) 13.) From the testimony to which reference already has been made, it may be inferred that the basement was necessarily used with,

and was reasonably necessary to the use of the barber-shop occupied by Cooley *a fortiori,* it may well be that the evidence that was introduced in the court *a quo,* but not brought up by the record on this appeal, showed that the basement necessarily was used with the barber-shop, and that, therefore, it passed by the lease as an incident or an appurtenance to the storeroom described in the written document itself.''

■ The above principles are well settled. Supported by many authorities, the principles are stated as follows in 36 Cor. Jur. 39, section 630:

''A lease of a particular part of a building gives the lessee no rights outside of such part, except such as were intended to be included as appurtenant to the beneficial enjoyment thereof, or such as it was manifest had been designed and appropriated for the benefit of the leased premises.''

In 36 Cor. Jur. 30, section 632, it is stated:

''As a general rule everything which belongs to the demised premises or is used with, and appurtenant to, them and which is reasonably essential to their enjoyment passes as an incident to them, unless specially reserved. This rule, for example, applies to a lease of a part of a building.''

Applying the above principles to the present case, we must conclude that whether the basement passed under the lease to Mrs. Walsh was a question of fact, and further, that since the evidence is conflicting, we are bound by the determination of the jury on this point. It is true that as originally constructed the basement was obviously intended to be used by the tenant of the Sweet Shop. As already pointed out, as originally constructed, the only means of ingress to and egress from the basement was through the trap door located in the floor of the Sweet Shop and down the iron stairway located in the basement. It is also true that the basement room in question is directly under the Sweet Shop and, except that it extends under the sidewalk, is exactly of the same dimensions. It is also true that the carbonator was installed in the basement and that the carbonator was for the use and benefit of the Sweet Shop. All these are facts which tend to indicate that the basement was included in the lease. If the jury had found for appellant, the above evidence and the other evidence offered by appellant, would

undoubtedly have supported an implied finding that the basement was included in the lease. But there is substantial evidence that supports a contrary conclusion. It is an undisputed fact that when the lease between Mrs. Walsh and appellant was entered into in August, 1931, the basement room was not then in use as a part of the Sweet Shop and had not, in fact, been used by any tenant of the Sweet Shop since about 1925. Mrs. Reardon testified that she operated the Sweet Shop from 1925 to 1929; that when she first went into possession she went into the basement and found that she could not use it; that "we didn't use the basement while I had possession of the shop"; that she covered the floor with linoleum and built a booth over the trap door; that some time during her occupancy the hole between the restaurant basement and the basement under the Sweet Shop was put into the partition; that she did not authorize the placing of the hole there nor know who did it; that after the hole was placed in the partition she did not use the basement for any purpose.

When the property was leased to Mrs. Walsh in August, 1931, nothing was said by either party to the lease as to whether the basement was included. When this lease was entered into, the basement was not then in use as part of the Sweet Shop. To use the exact language of the Runyon case, *supra*, the basement was not then "necessarily used with or reasonably necessary to the enjoyment of the part demised". The trap door was covered with linoleum. Mrs. Walsh immediately had the entire floor, including the trap door, covered with a solid piece of linoleum and immediately erected in the Sweet Shop over the trap door a semi-permanent structure. During the tenancy of Mrs. Walsh, the trap door was never opened. Milne, her manager, testified that from the beginning of the tenancy until the death of Bellon, he had been in the basement only twice, and both times went in through the hole in the partition to observe the carbonator; that the first visit was at least two months after the carbonator was installed. He further testified that he did not use the basement "for any purpose". It is admitted that from 1925 to 1932 the trap door was never used.

The only possible use made of the basement by Mrs. Walsh was for the carbonator, which was installed in October,

1931. Milne testified that he did not authorize the installation of the drop cord; that he did not authorize Howerton to install the carbonator in the basement; that he did not tell Howerton where to install it; that the old carbonating machine that was superseded by the new machine was entirely located in the Sweet Shop; that he, Milne, left the location of the machine entirely to Howerton; that he did not authorize Howerton to connect the machine to any electric wiring; that he did not show Howerton how to get into the basement; that he did not know who connected the wiring; that he left all these matters to Howerton; that he carried on the negotiations for the lease; that during those negotiations the basement was never mentioned; that, as far as he knew, no one requested permission from anyone to put the carbonator in the basement; that he did not place in the basement any of the refuse or other material the basement contained. Howerton corroborated Milne in every respect. He testified that he asked permission from no one to install the carbonator and asked no one's permission to enlarge the hole in the wall. He further denied having connected the carbonator to the electricity and particularly denied having connected the drop cord. Everyone connected with this case denied not only responsibility for the installation of the drop cord, but also any knowledge of who connected it. Milne testified that when he went into the basement two months after the carbonator was installed, the drop cord was then connected. Kendrick, manager of appellant, testified that he had been manager of the Balboa Theatre since April 1, 1931, and manager of the appellant corporation since December 9, 1931; that during the period he had been connected with the building he had never been in the basement under the Sweet Shop until the time of the death of Bellon.

We think enough of the evidence has been summarized to indicate that, although the question is a close one, there is substantial evidence to sustain the implied finding of the jury that the basement did not pass under the lease. Under such circumstances, we are without power to disturb the verdict. As was said in *Crawford* v. *Southern Pacific Co.*, 3 Cal. (2d) 427 [45 Pac. (2d) 183]:

"In reviewing the evidence on such an appeal all conflicts must be resolved in favor of the respondent, and all legi-

timate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often over-looked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.''

■ Having established that the implied finding of the jury that the basement under the Sweet Shop did not pass under the lease and so remained in the possession and under the control of appellant, it of course, follows that appellant owed Bellon, who was admittedly an invitee, a duty to use reasonable care to see that the premises under its control were in a reasonably safe condition. ■ We think the evidence is sufficient to sustain the theory that Bellon was directly invited to the premises by appellant, but even if the invitation was made by the proprietors of the restaurant, appellant was under a duty to use reasonable care in pro-tecting the premises still under its control when such in-vitees might reasonably be expected to enter. (*Davis* v. *Pacific Power Co.*, 107 Cal. 563 [40 Pac. 950, 48 Am. St. Rep. 156]; *Brown* v. *Pepperdine*, 53 Cal. App. 334 [200 Pac. 36]; 15 Cal. Jur. 741, sec. 153.)

■ The next major contention of appellant is that Bellon was guilty of contributory negligence as a matter of law. It is contended that the wire was in such a defective con-dition that he should have seen to its condition; that he should have reasonably anticipated the very injury that occurred; that permitting the free end of the tape to thrash about the room where electric equipment was present must be held to be negligence as a matter of law. This contention is without merit. ■ As was said in *Crawford* v. *South-ern Pacific Co., supra*, page 429:

''To establish the defense of contributory negligence as against the verdict of a jury, the evidence must be such that the appellate court can say that there is no substantial conflict on the facts, and that from the facts reasonable men can draw but one inference, which inference points

uncrringly to the negligence of the plaintiff proximately contributing to his own injury.''

Tested by this standard, we cannot say as a matter of law that the defect was so obvious and patent that Bellon should have seen it and guarded against it. As an invitee, Bellon was entitled to assume that the premises he was invited to enter were reasonably safe for the purpose for which the invitation was extended. This rule is well setled. One of the most recent cases so holding is *Mendelsohn* v. *Van-Herick*, 133 Cal. App. 612 [24 Pac. (2d) 878].

■ Appellant also complains of the giving of certain instructions and of the failure to give others. Appellant asked for an instruction tantamount to a request for a directed verdict, to the effect that there was no evidence tending to prove it had control of the basement. For reasons already discussed, that instruction was properly refused. ■ The trial court properly instructed the jury that a landlord is not liable for injuries resulting from a tenant's failure to keep the leased premises in repair, and further instructed the jury that ''if you find from the evidence that the defendant Silver Gate Theatres, Inc., a corporation, exercised no control over the premises in question, then your verdict must be in favor of defendant.'' This was a correct statement of the law. ■ Appellant also objects to a series of instructions discussing the landlord's liability when it retains control over a portion of the premises for the mutual benefit of all the tenants. These were proper instructions. The jury, under the evidence, could have found either that the basement did not pass under the lease, or, if it did so pass, that the landlord retained sufficient control to bring it within the rule contained in the above instructions. Respondent was entitled to have the jury fully instructed on both theories. ■ Appellant also complains that no instruction was given on what constituted ''control'' or what was meant by the word ''premises''. Under the circumstances, such instructions were not necessary. Appellant also complains that other instructions were not given. In many of these cases, the appellant failed to offer an instruction on the point and so cannot complain. We have examined the entire charge. We think it correctly and properly stated the law applicable to the facts and is entirely free from error.

The charge that the trial court improperly excluded evidence is also without merit.

Appellant also complains that the wife brought this action in her own name, when she knew that she was not the sole heir of the deceased, the father and mother of the decedent surviving him. It is contended that under section 377 of the Code of Civil Procedure, the action for the wrongful death of an adult, when not brought by the personal representative of the decedent, must be brought by the *heirs* of the decedent. That is undoubtedly the law. This action was brought by plaintiff as the widow of Bellon. The latter's mother and father were not joined as plaintiffs. The complaint did not allege that plaintiff was the sole heir of the deceased. At the beginning of the trial, the trial court properly permitted plaintiff to amend to supply this deficiency. Later, when it was made to appear that she was not the sole heir of the deceased, the trial court permitted her to amend, over defendant's objections, to join as parties the mother and father. Contemporaneously therewith, the father and mother were permitted to file a document by which they waived all claim or interest in the action and specifically waived all claims to damages. The procedure may have been somewhat irregular, but just how appellant suffered injury thereby is not pointed out. The only heirs were the respondent and Bellon's mother and father. The latter two having waived their claim to damages, the respondent was the proper party to maintain the action. (See generally, *Rabe* v. *Western Union Tel. Co.,* 198 Cal. 290 [244 Pac. 1077]; *Salmon* v. *Rathjens,* 152 Cal. 290 [92 Pac. 733].)

The appellant also urges that the award of $20,000 is excessive. The point is without merit. The decedent was 28 years of age, with a life expectancy of 36.73 years. He was a trained plumber and was about to succeed to the established business of his father. The latter testified that he intended retiring and turning the business over to his son. The net yearly earnings of this business for the year prior to Bellon's death were over $30,000 and, in the year of his death, were between $8,000 and $9,000. He was earning at the time of his death about $250 a month, plus a substantial bonus. Under such circumstances, the award is well within the limits of reasonableness.

The judgment appealed from by defendant is affirmed.

 Plaintiff has appealed from that portion of the judgment entered in favor of three of the defendants on a directed verdict. No mention is made in the briefs on file of the issues involved in plaintiff's appeal. This appeal, having apparently been abandoned, is hereby dismissed.

Curtis, J., Langdon, J., Waste, C. J., Shenk, J., Thompson, J., and Seawell, J., concurred.

Rehearing denied.