[Civ. No. 12701. First Dist., Div. One. May 29, 1945.]

EMMA FOY TAYLOR, Respondent, v. MARIE A. WRIGHT et al., Appellants.

372

Fitzgerald, Abbott & Beardsley for Appellants.

Robert E. Hatch for Respondent.

PETERS, P. J.—Plaintiff, Emma Foy Taylor, brought this action against Marie A. Wright and Allen J. Wright, mother and son, and others, to recover damages for fraud alleged to have been committed by defendants in buying 3,750 shares of stock owned by her in the Commonwealth Acceptance Corporation at less than its actual value. The jury returned a verdict for compensatory damages in the sum of $4,250, exemplary damages in the sum of $500, and interest in the sum of $1,912.50. From the judgment based on these verdicts the Wrights appeal.

This case has been tried twice. In the first trial plaintiff obtained a verdict of $6,462.50, and the trial judge added interest of $3,153.75. Defendants' motion for a new trial based on insufficiency of the evidence to sustain the verdict was granted.

Appellants' main contention on this appeal is that the evidence is insufficient, as a matter of law, to sustain the judgment. They urge that their motions for a nonsuit and directed verdict should have been granted, and request this court, under section 629 of the Code of Civil Procedure, to order judgment to be entered for them. It is also contended that the action is barred by the statute of limitations, and that it was error to instruct the jury that in its discretion it might award exemplary damages and interest in this action.

So far as the question of the sufficiency of the evidence is concerned, when the proper basis of liability is ascertained,

we are presented with the usual fact case. As will be later pointed out, under the facts, the Wrights owed a duty of disclosure to the respondent. Mrs. Taylor produced evidence, which if believed by the jury, as it was, shows that the Wrights violated that duty and that she was damaged thereby. The appellants produced evidence, which if believed by the jury, which it was not, would have supported implied findings of honesty and fair dealing. In such a case it is for the jury, and the trial judge in passing on the motion for a new trial, to pass upon the credibility of the witnesses. It is not for the appellate court to determine where the truth lies. The appellate court has no power to weigh the evidence. The appellants, by emphasizing certain evidence, and by disregarding certain other evidence, particularly certain legitimate and reasonable inferences from the evidence which they characterize as mere "conjecture" and "surmise," make a quite persuasive argument that the evidence is insufficient to support the judgment. When the entire record is considered, however, we are convinced that the implied findings of the jury are supported by substantial evidence and by legitimate and reasonable inferences from that evidence.

Although the rules applicable to the power of the appellate courts in passing upon the sufficiency of the evidence are elementary and have been frequently stated, in view of the apparent sincerity with which appellants contend that the evidence is insufficient, it would appear proper to refer briefly to such rules before pointing out the evidence that supports the judgment. In *Crawford* v. *Southern Pacific Co.*, 3 Cal.2d 427, 429 [45 P.2d 183], these rules are briefly stated as follows: "In reviewing the evidence on such an appeal all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often overlooked, principle of law that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (See, also, *Albaugh* v. *Mt. Shasta Power Corp.*, 9 Cal.2d 751 [73 P.2d 217]; *Bellon* v. *Silver Gates Theatres, Inc.*, 4 Cal.2d 1 [47 P.2d 462]; *Raggio* v. *Mallory*,

10 Cal.2d 723 [76 P.2d 660] ; *Estate of Bristol,* 23 Cal.2d 221 [143 P.2d 689] ; *Juchert* v. *California Water Service Co.,* 16 Cal.2d 500 [106 P.2d 886] ; *Peri* v. *Los Angeles Junction Ry.,* 22 Cal.2d 111 [137 P.2d 441] ; *Atherley* v. *Market St. Ry. Co.,* 42 Cal.App.2d 354 [108 P.2d 927] ; *Estate of Pessagno,* 58 Cal.App.2d 390 [136 P.2d 644] ; *Laherty* v. *Connell,* 64 Cal. App.2d 355 [148 P.2d 895].)

Applying these well settled rules to the record before us, the following facts appear. The respondent is a widow, aged 77 years. She had purchased 3,750 shares of stock in the Commonwealth Acceptance Corporation in 1928 or 1929 for $15,000, from a Miss Cousins, who introduced her to Mr. Lester Johnson, president of the company. Johnson is a brother-in-law of appellant Allen Wright, and was president of the company during all times here pertinent. He was originally named as a defendant but was granted a nonsuit at the first trial. The trial court excluded evidence of the content of many conversations respondent had with Johnson relating to her stock, and relating to the transaction here challenged, but sufficient was admitted to show that respondent had implicit faith in Johnson and relied upon him for advice. It also appears that Johnson and appellant Allen Wright were the two executives of the company and actually ran the company. They frequently discussed the company affairs during all times here pertinent. Mrs. Wright was a large stockholder of the company. She was a director as was her son Allen Wright. Allen Wright was also a stockholder and an officer, being secretary. From 1933 through 1936 Mrs. Wright began to buy additional stock in the company, and by the end of 1936 she owned about half the issued stock.

The Commonwealth Acceptance Corporation is a Delaware company with its principal and only office in Oakland, California. The company was originally organized in 1925 to handle automobile financing. Later, and starting about 1931, it began to deal in stocks, and ultimately its greatest business was in the investment field. One of the securities it began to purchase in 1931 was Shell Union stock. By December of 1935 the Shell stock had appreciated in value over $80,000—that is, had the Shell stock been sold it would have brought in an $80,000 profit to the company.

The company through its board of directors, the two defendants and Johnson constituting a majority of the board,

stopped paying dividends in 1931, the last dividend being paid in October of 1931. Each year, about March or April, the company issued to its stockholders a financial statement for the preceding year. The statement of 1933 showed a net profit of $86.35 for the year's operation. That for 1934, issued in March 1935, showed a net loss of $3,615.53. These various statements listed as an asset an item of "marketable securities" at "cost." The various stocks were not listed, but the cost price of the entire portfolio was set forth. This was admittedly one proper way to make up a financial statement. Such a statement is relatively valueless, however, because it does not give the present market value of the securities.

As already pointed out, respondent owned 3,750 shares of stock in the company, and in 1935 she was the fifth largest stockholder. She had incurred an indebtedness with the American Trust Company, First Berkeley branch, and in 1931 pledged the 3,750 shares with that bank, together with other collateral, to secure the loan. The pledge agreement was in the usual form used in such transactions. By 1935 she had reduced the loan to $5,700. The loan, in that year, was what is known as a "distressed loan," that is, the security was not sufficient to support the loan and respondent was apparently unable to make the called for payments. The bank had several times tried to ascertain the value of the Commonwealth stock. The stock was not listed on any exchange and there was no over-the-counter market. The bank's officers had several times called Johnson or appellant Allen Wright and had been told by them that there was no market or prospective purchasers for the stock.

During the fall of 1935 some of the stockholders of the company, not including respondent, became dissatisfied with the way Johnson and the Wrights were running the company. Some of the stockholders were particularly disturbed by a transaction whereby another corporation wholly owned by Johnson and the Wrights, and which owed Commonwealth over $26,000, became a "subsidiary" of Commonwealth, and by this means apparently the debt was extinguished.

This then was the background as it existed in November of 1935. A corporation which had been transformed into an investment company that was highly solvent and which could on very short notice have liquidated just one of its assets—the Shell stock—at a profit of over $80,000. No dividends

had been paid for four years. The only way it could make a profit was to sell some of its stock. So far as the financial statements issued to the stockholders are concerned they showed that the company was being operated at a loss, which was increasing year by year. Some stockholders were getting impatient with the management. Under these circumstances, and knowing exactly the financial condition of the company, appellant Allen Wright hired Ben T. Stowell as an agent for his mother. Wright testified that the main purpose of hiring Stowell was to have him ascertain the attitudes of the various groups of stockholders. It is admitted, however, that Wright also authorized Stowell to offer to buy the shares of dissatisfied stockholders who wished to sell. It is highly significant that Stowell's sole compensation for services rendered was to be a commission of 20 cents per share for each share of stock purchased. The jury could have reasonably disbelieved Wright's and Stowell's testimony that the main reason why Stowell was hired was to ascertain the attitude of dissenting stockholders. Both Wright and Stowell admitted that Stowell was instructed not to volunteer any information as to who his principal was, and it is admitted that Stowell told no one connected with the Taylor deal that he was actually acting on behalf of the Wrights. It is a legitimate and reasonable inference that Wright hired Stowell to buy the stock of stockholders and deliberately withheld from the prospective sellers the identity of the purchaser. It is also a legitimate and reasonable inference from the evidence that all this was done as part of a scheme conceived by Wright whereby he and his mother could secure the stock of this company at depressed values for lower than the real value of such stock.

The stock at this time had a liquidation value of at least $2.20 per share, and an actual value much higher. It should be here mentioned that the jury by its verdict fixed the value of the stock at $2.20, and thus allowed damages based on the lowest possible value appearing in the evidence. It was apparently Wright's desire to buy as much of the stock as possible at about $1.00 a share and thus not only make a handsome profit, but also, through his mother, get control of the company. Wright had an intimate knowledge of the corporation's holdings. He followed the market daily, and although he testified he thought the liquidation value of the stock was about $1.50 per share, it is a legitimate and reason-

able inference from the evidence that he actually knew it was at least $2.20. All during this period Wright was in frequent communication with Johnson about corporate affairs, but he testified he did not tell Johnson about the hiring of Stowell, although Johnson was president of the company and related by marriage to Wright. According to Wright, Johnson did not know anything about Stowell until after the Taylor deal was closed.

In order to get Stowell started Allen Wright gave him a list of some of the stockholders. Mrs. Taylor's name was not on the list. She had not aligned herself with any of the complaining stockholder groups. On the list furnished by Wright was the name of Mrs. Taylor's cousin. Stowell, according to his testimony, called on this cousin and from her learned of the stock holding of Mrs. Taylor. He called upon Mrs. Taylor at her hotel and learned from her that the stock was pledged with the American Trust Company. Stowell then told these facts to Wright, who authorized Stowell to offer $1.00 a share for the stock. Wright knew the stock had been pledged with the bank and knew the general condition of the loan. Stowell called upon the officers of the bank and offered them $3,750, that is $1.00 a share, for the stock. As already pointed out, the liquidating value of the stock on this date was $2.20 a share, and there is evidence that the book value was $3.10, it being admitted by appellants that such book value was at least $2.79 per share. There is conflicting evidence as to whether Stowell furnished the bank with any computations. There is some evidence that the financial report of 1934 showing the company was being operated at a loss was furnished by Stowell to the bank's officers. At any rate, the bank's officers got in touch with Mrs. Taylor. She refused the offer of $3,750 and went home. The bank officer then telephoned her and told her the offer had been raised to $4,000. Mrs. Taylor testified that she felt this price was too low but that she telephoned Johnson and after talking with him agreed to accept the offer. She was not permitted to testify as to what Johnson had told her. It was stipulated that Allen Wright was acting as agent for his mother in these various transactions.

On December 5, 1935, the bank closed the transaction, and the stock was sold to Stowell for $4,000, Stowell receiving a commission from Wright of $50. Although this transaction was completed December 5, 1935, Wright did not have

the stock certificate changed into his mother's name on the books of the company until April 28, 1936.

Mrs. Taylor testified that she did not know Stowell was acting for a director, and that had she known that fact she would not have sold at such a price. It is this transaction that is challenged in this proceeding. The complaint was not filed until December 18, 1939. Mrs. Taylor testified that several months after the deal was closed she heard from a boarder at her home, a law student, rumors that her stock had been bought by an "insider." She immediately called Johnson, and after talking with him she did not believe the rumor that Stowell bought on behalf of a director. Several years later the law student again came to her with this rumor, and she again called Johnson. Again, after calling him, she did not believe the rumor. It should be here mentioned that Johnson then knew Stowell had acted on behalf of the Wrights. It was not until she heard the rumor again in December, 1939, that she really became suspicious, and after investigation, filed this action.

On these facts, the first question of law to be determined is whether directors and officers of a company owe any duty at all to stockholders in relation to transactions whereby the officers and directors buy for themselves shares of stock from the stockholders. On this subject there are three rules —the so-called majority rule, the so-called "special facts" rule, and the so-called minority rule. These three rules were exhaustively discussed in the case of *American Trust Co.* v. *California etc. Ins. Co.*, 15 Cal.2d 42 [98 P.2d 497]. The so-called majority rule is frequently stated to be that directors and officers owe no fiduciary duty at all to stockholders, but may deal with them at arm's length. No duty of disclosure of facts known to the director or officer exists. Nondisclosure cannot constitute constructive fraud. At page 56 of the American Trust case, *supra*, the court states the so-called majority rule to be ". . . that a corportion director owes no fiduciary obligation to the stockholder as such, but only to the corporation. Hence . . . nondisclosure . . . was not fraudulent because there was no duty to disclose.

"The doctrine upon which appellants rely, which is said to be the majority rule, is in substance that a director is a fiduciary with respect to the corporation as an entity, and not to the stockholders as individuals. Otherwise expressed, it is that in dealings with or for the corporation, the director

is exercising a corporate function, and is subject to the usual fiduciary duty to disclose all material facts; but that in personal dealings with stockholders he is not exercising a corporate function, and is free to deal with them at arm's length. Nearly all of the cases applying the rule are concerned with transactions for the purchase of stock between director and stockholder, and they hold that the director need not disclose to the stockholder his special knowledge affecting the value of the shares.''

The Supreme Court, in the American Trust case, *supra,* after thus referring to the so-called majority view, then stated (p. 56): ''In sharp contrast with this view is the so-called minority rule, which recognizes the director's obligation to the stockholders individually as well as collectively, and refuses to permit him to profit at the latters' expense by the use of information obtained as a result of his official position and duties. This view, while generally conceded to be in the numerical minority, is followed by able courts, and text-writers who have examined the subject,'' citing cases from Iowa, Georgia and Kansas, and referring to Ballantine, Private Corporations, section 125; Stevens on Corporations, section 145; 4 Pomeroy, Equity Jurisprudence (5th ed.) § 1090; 19 Corn.L.Q. 103; 45 Harv.L.Rev. 1388; 39 Yale L.J. 582.

While it is true that a numerical majority of the decided cases have adopted the legalistic view that a director owes no duty at all to the stockholders, a substantial minority have adopted the more realistic view that such a duty exists because the stockholders have placed the directors in a strategic position where they can secure first-hand knowledge of important developments, and where they can make it appear the shares are much less valuable than they really are. The astonishing thing is that practically every legal writer in this field has approved the so-called minority view. (In addition to the authorities cited by the Supreme Court see Berle, *Publicity of Accounts and Directors' Purchases of Stock,* 25 Mich.L.Rev. 827; Laylin, *The Duty of a Director Purchasing Shares of Stock,* 27 Yale L.J. 731; Wilgus, *Purchase of Shares of Corporation by a Director from a Shareholder,* 8 Mich.L. Rev. 267; 3 Fletcher, Cyclopedia Corporations (Perm. ed.), §§ 848 and 1174; 32 Mich.L.Rev. 678; 14 Minn.L.Rev. 530; 11 Wis.L.Rev. 547; 29 Cal.L.Rev. 67; 54 Harv.L.Rev. 1191;

but see Walker, *The Duty of Disclosure by a Director Purchasing Stock from his Stockholders*, 32 Yale L.J. 637.)

■ The so-called majority rule is predicated on the theory that the corporation—the collective stockholders—is a separate and distinct legal entity, an artificial personality, to whom the director owes his duty. The legal writers above referred to and the more recent cases adopting the minority view, have pointed out the fallacy of this reasoning. These authorities logically point out that the detailed information a director has of corporate affairs is in a very real sense property of the corporation, and that no director should be permitted to use such information for his own benefit at the expense of his stockholders. The so-called majority rule permits a director to secure for himself profits rightfully belonging to all. Such a rule offends the moral sense, and is contrary to our modern concept of the duty of a director towards those he represents.

Although the numerical weight of authority is in favor of the so-called majority rule, the harshness and obvious unfairness of that rule, has led many of the states that originally aligned themselves with the majority rule to adopt an exception to that rule to ameliorate its harshness. This exception is referred to as follows in the American Trust Co. case, *supra,* page 57: "Conceding the absence of a fiduciary relationship in the ordinary case, they [some of the states that have adopted the so-called majority view] nevertheless hold that where special circumstances or facts are present which make it inequitable for the director to withhold information from the stockholder, the duty to disclose arises, and concealment is a fraud." The leading case adopting this "special facts" exception to the so-called majority rule is *Strong* v. *Repide,* 213 U.S. 419 [29 S.Ct. 521, 53 L.Ed. 853]. That case differs from the present one in many respects, but it is significant that the United States Supreme Court there held that, among other things there present, it was fraudulent for a director to buy from a shareholder without disclosing his identity. "Concealing his identity when procuring the purchase of the stock, by his agent, was in itself strong evidence of fraud." (213 U.S. at p. 432.)

The exact rule that exists in this state is somewhat uncertain. The cases of *Ryder* v. *Bamberger,* 172 Cal. 791 [158 P. 753]; *Robbins* v. *Pacific Eastern Corp.,* 8 Cal.2d 241 [65

P.2d 42]; *McCord* v. *Martin,* 47 Cal.App. 717 [191 P. 89], and *Bacon* v. *Soule,* 19 Cal.App. 428 [126 P. 384], contain some language that supports the advocates of the so-called majority rule. These cases were analyzed at length by the Supreme Court in the American Trust Co. case, *supra.* It was there held that what was said in these cases on the subject was dictum. At page 61 the court concluded as follows: "In this connection, we may observe that the question is still open in this state as to whether we shall follow the majority rule, the majority rule as modified by the 'special facts' doctrine, or the minority rule; and a decision on this question would be immaterial here."

In the present case the trial court instructed on the so-called "special facts" doctrine, and no challenge is made as to the form of the instruction. Whether this rule, or the so-called minority rule is ultimately to be adopted in this state need not now be decided. No reasonable argument can be advanced against the adoption of at least the "special facts" limitation to the majority rule. A fair reading of the American Trust Co. case, *supra,* indicates that the Supreme Court, although not directly deciding the point, has indicated a disapproval of the so-called majority rule, and that when the point is directly presented to it, it will adopt either the "special facts" doctrine or the minority rule.

Assuming that the "special facts" doctrine, at least, is applicable in this state, there can be no reasonable doubt but that the appellants, under the facts, owed respondent a duty, and violated that duty to her damage. The stock here involved was not sold or traded on any exchange. The appellants actively and successfully concealed their identity as the purchasers. The appellants, by reason of their position as directors, had full knowledge of the actual value of the stock. The appellants were active in inducing the sale. They sought out the respondent and made no effort to tell her the real value of her stock, but kept that knowledge, which they had acquired as directors, to themselves. Moreover, the appellants knew they were buying pledged stock, and that the loan for which the stock was pledged was "distressed." They knew that the bank's primary interest was to secure enough for the stock to put the loan in a sound condition. They knew that respondent would find it difficult to resist their offer should the bank deem it acceptable. Obviously, both the respondent and the bank would have been suspicious had

they known who the true purchasers were. Under such circumstances the implied findings of the jury that appellants were guilty of fraud within the meaning of the "special facts" rule are amply supported by the evidence.

Appellants make much of the fact that there is no legal requirement that they disclose the market value of the securities to the stockholders, and that setting forth security values at cost in the financial statements is an approved accounting practice. That is undoubtedly true, but we are here dealing with a corporation which was largely controlled by two men who had intimate and detailed knowledge of the market value of the company. They knew as practical men that none of the stockholders had that knowledge. When Wright actively solicited a sale from respondent he was, under the facts, under a duty to speak fully, fairly and honestly. This he did not do.

Appellants also point out that the books of the company disclosed the information as to the ownership of the Shell Union stock, and that such books were located at the Oakland office. Any stockholder, according to appellants, could have come to the office and ascertained the true facts for themselves. To state the point is to refute it. Such argument loses sight of the realities of the situation. A stockholder is not bound to anticipate fraud on the part of his trusted director. The legal right to look at the books, in view of the complexity of modern accounting practices, cannot preclude a stockholder from recovering from a fraudulent director.

Appellants also argue that they did not buy from respondent but bought from the bank at a pledgee sale. Just where this argument leads is not very clear. Under any theory respondent had an equity in the stock. There is substantial evidence that whatever the legal rights of the bank may have been the bank sought and secured respondent's consent to the sale before it was consummated. The bank purported to act and did act as her agent in completing the sale.

The appellants also claim that the cause of action was barred as a matter of law by the statute of limitations contained in subdivision 4 of section 338, Code of Civil Procedure. That section requires actions based on fraud to be commenced within three years but "The cause of action in such case not to be deemed to have accrued until the dis-

covery, by the aggrieved party, of the facts constituting the fraud or mistake.'' In the present case appellants do not attack the sufficiency of the pleading of respondent relating to the alleged fraud and the circumstances of its discovery, nor do they attack the correctness of the instructions given on this subject. What they argue is that the implied finding of the jury that respondent acted reasonably in not discovering the fraud sooner, as a matter of law, is unsupported. The point is without merit. The evidence shows that several months after the transaction respondent heard a rumor from a law student boarding at her home that an ''insider'' had in fact purchased her stock. She immediately telephoned Johnson, her trusted friend, and after talking to him did not believe the rumor. Several years later she again heard the same rumor and investigated again by telephoning Johnson. Again she was convinced the rumor was false. Johnson, at least at the time of the second conversation and probably at the time of the first, knew the true facts. Under the circumstances the question as to whether respondent acted reasonably in not discovering the fraud sooner was one of fact for the jury. Whether the evidence is sufficient to support the implied finding on this issue is a mixed question of law and fact. In *Mitchell* v. *Towne,* 31 Cal.App.2d 259, 262 [87 P.2d 908], the proper rule is stated, quoting from *Cullinan* v. *McColgan,* 87 Cal.App. 684, 692 [263 P. 353], as follows: '' ' . . . where issue is joined on a plea of the statute and the evidence is conflicting as to when, with reference to the filing of the complaint, a cause of action accrued, the question is properly submitted to the jury as a mixed question of law and fact. (*Pacific Imp. Co.* v. *Maxwell,* 26 Cal.App. 265 [146 P. 900]; *Towle* v. *Sweeney, supra,* [2 Cal. App. 29 (83 P. 74)]; *Crawford* v. *Duncan,* 61 Cal.App. 647 [215 P. 573]), and the case may not be taken from the jury where the plea of the statute is interposed and there is evidence to support the plea. (*Heilbron* v. *Heinlen,* 72 Cal. 376 [14 P. 24].)' '' (See, also, cases collected 16 Cal.Jur. § 221, p. 629.)

Appellants' last contention is that it was error to instruct the jury that it, in its discretion, could make an award for exemplary damages and for interest. It is urged that in this action neither of these items is recoverable. The contention is based upon appellants' interpretation of several code sections.

All of the pertinent code sections appear in division fourth of the Civil Code. In title II, chapter 1, article II of that division appears section 3288 which provides: "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury."

In Article III of the same title and chapter appears section 3294 which provides: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

In chapter II of the same title and division, but in article II, appears section 3343, added to the Civil Code in 1935. It provides: "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction.

"Nothing herein contained shall be deemed to deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled."

In the same chapter—chapter II—but in article IV, appears section 3357, which provides: "The damages prescribed by *this chapter* are exclusive of exemplary damages and interest, except where those are expressly mentioned." (Italics added.)

Appellants make two contentions in reference to these code sections. They first urge that respondent may not recover interest and exemplary damages because by sections 3288 and 3294, *supra*, such recovery is limited to cases "not arising from contract," and this action arose from contract. This contention is clearly without merit. This action is based on fraud and deceit. It did not arise out of a contract as those words are used in the sections in question. Those sections limit the right to recover exemplary damages and interest, in the discretion of the jury, to cases based on tort and exclude contract actions. The present action is one in tort, to recover for fraud. The contract was only the result of

that fraud. The action arises out of tort and not out of contract.

The second contention of appellants is that even if the action does not arise out of contract, respondent cannot recover exemplary damages and interest because of the provisions of section 3357, *supra*. It is urged that that section by its terms limits the right to recover exemplary damages and interest, even in tort actions, to cases where such allowance is expressly provided for in the same chapter of the code in which section 3357 appears. It is urged that since sections 3288 and 3294 appear in a different chapter of the Civil Code, they form no basis for the allowance in this case.

The fallacy in this argument is demonstrated when the provisions of section 3343 of the Civil Code are considered, which is in the same chapter of the code as section 3357. The last portion of the first sentence of the section reads "together with any additional damage arising from the particular transaction." The next sentence of the section expressly states that the section shall not "deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled"—i. e., among other things, the remedies prescribed in sections 3288 and 3294 of the Civil Code. It is at once apparent, even if the last sentence of the first paragraph above quoted refers only to special damage, that the last sentence quoted above refers to other remedies given by other sections of the code, and that among such remedies are those provided in sections 3288 and 3294. It was proper, therefore, to instruct the jury on these two issues. No point is made as to the form of the instructions or as to the amounts awarded.

The cases cited by appellants—*Ellsworth* v. *Knowles,* 8 Cal. App. 630 [97 P. 690], and *Morrell* v. *San Tomas etc. Packing Co.,* 13 Cal.App. 305 [109 P. 632]—do not compel or suggest a different conclusion. The latest of these cases was decided in 1910, twenty-five years before section 3343 of the Civil Code was adopted. Both actions were for breach of contract and were not based on tort. What was said in those cases has no relevancy to the present case.

The judgment appealed from is affirmed.

KNIGHT, J.—I concur in the judgment of affirmance upon the ground that the evidence is sufficient to establish a case

of fraud regardless of the question of the application of the so-called "special facts" doctrine. However, in view of the majority decision this day rendered by the Supreme Court in the case of *Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412 [159 P.2d 958], the "special facts" doctrine doubtless does apply and therefore plaintiff is entitled to the benefit thereof in further support of the judgment.

WARD, J.—I concur. On the question of the relationship of officers to stockholders in the purchase of stock, I adhere to the "special facts" doctrine, which may be applied appropriately in this case. Upon this theory, I concur in the order affirming the judgment.

A petition for a rehearing was denied June 28, 1945, and the following opinion was thereupon rendered:

THE COURT.—Petitioner contends that the court has omitted material facts from its opinion, has misstated other facts, and has failed to consider substantial legal issues raised by appellants. These contentions all lack merit. A reexamination of the opinion in the light of the record discloses that every material fact has been set forth in the opinion, and that every material fact set forth in the opinion is supported by substantial evidence or by reasonable inferences therefrom. The opinion disposes of every relevant legal issue raised on the appeal. The briefs of appellants and this petition cite the frequently relied upon but seldom followed case of *Herbert* v. *Lankershim*, 9 Cal.2d 409 [71 P.2d 220], and ask us to disregard conflicts in the evidence. This we cannot and should not do.

The petition for rehearing is denied.

Appellants' petition for a hearing by the Supreme Court was denied July 26, 1945.